In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3875

MARILYN MULERO,

*Petitioner-Appellant*,

*v.*

SHERYL THOMPSON, Warden of the
Dwight Correctional Center,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CV 03146—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED SEPTEMBER 15, 2011—DECIDED FEBRUARY 7, 2012

Before BAUER, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Marilyn Mulero was charged in Illinois with four counts of murder, two counts of conspiracy to commit murder, and one count of unlawful use of a firearm by a felon. She entered a blind plea of guilty and the counts were then merged, resulting in a state trial court entering judgment against Mulero on two counts of intentional murder.

Mulero was eventually sentenced to life imprisonment—the mandatory minimum sentence for a double homicide. After exhausting her state court remedies, Mulero filed a petition for habeas relief in the district court, alleging her trial attorney provided ineffective assistance of counsel. The district court concluded that many of Mulero's ineffective assistance claims were defaulted and held that the non-defaulted claims failed on the merits. The district court then granted a certificate of appealability limited to two issues—whether Mulero's attorney was ineffective for, prior to advising Mulero concerning her desire to enter a blind plea of guilty, 1) failing to investigate witnesses, and 2) failing to obtain supporting services. Mulero presents those issues on appeal, arguing ten specific alleged failings by her attorney. We conclude that Mulero has preserved only three of these ten arguments—those she presented through one complete round of state court review. Specifically, Mulero has preserved only the questions of whether her attorney was ineffective for 1) failing to investigate witness Jackie Serrano; 2) failing to obtain psychological evidence to support an argument that Mulero's confession was involuntary; and 3) failing to recognize that witness Yvette Rodriguez had made inconsistent statements and had a motive to lie. While Mulero preserved these arguments, they all fail on the merits. Accordingly, we affirm.

I.

Nearly twenty years ago, on May 11, 1992, then-21-year-old petitioner Marilyn Mulero, 15-year-old Jacqueline

Montanez and 16-year-old Madeline Mendoza, all members of the Maniac Latin Disciples gang, decided to seek revenge for the Latin Kings' murder of their friend, "Mudo." Mulero borrowed her brother's car and one of the trio obtained a small silver automatic gun to carry out what they would later describe as a "mission" for their "nation." As they were leaving for their mission, the threesome saw Yvette Rodriguez. Rodriguez would later testify that they invited her to go "make a hit with them and roll on some flakes," which meant to kill or fight the Latin Kings. Rodriguez declined.

Mulero then drove Montanez and Mendoza into Latin Kings territory, where they saw two men in another car, Jimmy Cruz and Hector Reyes, whom Montanez recognized as Latin Kings. The young women invited Cruz and Reyes to "party" with them in nearby Humboldt Park. After they all arrived, Montanez went into the bathroom with Reyes and shot him in the back of the head, killing him. Montanez left the bathroom and, according to Mulero's original confession, then handed Mulero the gun and Mulero shot Cruz in the back of the head, killing him. The three then drove off.

At the time of the shooting, about 12:15 a.m. on May 12, 1992, Jackie Serrano was looking out of the window of her nearby apartment. She would later testify that she looked into the park after hearing some voices and giggling and that she saw three women, one of whom was taller than the others, and two men. She saw the taller female enter the restroom with a male, and after hearing a firecracker sound, Serrano saw her emerge

from the restroom alone. Serrano then saw a shorter female go behind the second male, observed a flash behind that man, and saw him fall to the ground. This evidence was consistent with Montanez shooting Reyes and Mulero shooting Cruz, as Montanez is 5'7" and Mulero is 5'1".

After the shooting, Rodriguez saw Mulero, Montanez, and Mendoza back in their neighborhood, and Mulero and Montanez were bragging about having murdered Cruz and Reyes. Later that evening, police arrested Rodriguez on a drug offense and Rodriguez identified Mulero, Montanez, and Mendoza as the perpetrators of Cruz's and Reyes's murders. The next day, officers arrested Mulero and Montanez, and a few days later they arrested Mendoza.

Following her arrest and substantial questioning, Mulero gave a court-reported statement to a Chicago detective and an assistant state's attorney. In her statement, she acknowledged her involvement as detailed above. Additionally, after she confessed to the murders, while being escorted through the police station, a television news camera captured Mulero shouting gang slogans, "KK," which means "king killers," and flashing gang signals with her hands.

The state charged Mulero with four counts of murder, two counts of conspiracy to commit murder, and one count of unlawful use of a firearm by a felon. On June 5, 1992, a Cook County Public Defender appeared on behalf of Mulero. The Public Defender represented Mulero until around early 1993, and during that time,

among other things, the Public Defender had an investigator speak with Serrano and filed a motion to suppress Mulero's confession. Then sometime in early to mid-1993, a couple for whom Mulero used to babysit hired a private attorney, Jeremiah Lynch, to represent Mulero. Lynch apparently filed an amended motion to suppress and then argued that motion. In June 1993, the state court denied the motion to suppress Mulero's confession, finding that Mulero's statement to the police was voluntary and that there were no promises, misrepresentations, or fabrications by the police.

Two months later, in August 1993, Montanez was convicted of the murders of Cruz and Reyes and sentenced to life imprisonment. (Because Montanez was a minor, she did not qualify for the death penalty.) At Montanez's trial, the prosecution presented Montanez's court-reported statement, which was consistent with Mulero's confession, and testimony from, among others, Rodriguez and Serrano. Following Montanez's conviction, Mendoza pleaded guilty on September 22, 1993, to one count of murder of Cruz and one count of conspiracy to murder Reyes. At her change of plea hearing, Mendoza swore under oath that Montanez had shot Reyes and that Mulero had shot Cruz. Less than a week later, on September 27, 1993, Mulero pleaded guilty to all counts without the benefit of a plea agreement—this is referred to as a blind plea.

At her change of plea hearing, Mulero testified that she was pleading guilty because she knew she was guilty and that it was her idea to plead guilty. Following

Mulero's guilty plea, the counts were merged, resulting in a state trial court entering judgment against Mulero on two counts of intentional murder. After pleading guilty, Mulero proceeded to the sentencing phase of the proceedings. In Illinois, the only possible sentences for two counts of intentional murder were life imprisonment without possibility of parole, or death. On November 12, 1993, a jury sentenced Mulero to death. On December 17, 1993, Lynch filed a motion for a new sentencing hearing, arguing that the trial court had erred in allowing the prosecution to argue at the sentencing hearing that Mulero was not truly remorseful for the crimes because she had filed a motion to suppress her confession. The trial court denied that motion and entered the sentence of death against Mulero.

Mulero appealed her death sentence directly to the Illinois Supreme Court. She also, on January 6, 1994, filed a pro se motion to withdraw her guilty plea. In her motion to withdraw her guilty plea Mulero argued, among other things, that Lynch had coerced her into pleading guilty. Counsel was later appointed to represent Mulero and to argue this motion. At the trial court's hearing on Mulero's motion to withdraw her guilty plea, Lynch testified at length. Lynch stated that he was hired by a family for whom Mulero used to babysit and that he took over the case from the Public Defender's office. Lynch noted that he visited the crime scene twice, reviewed discovery, and reviewed the Public Defender's file, including a statement from one of the Public Defender's investigators who had interviewed Serrano. Lynch also indicated that Serrano's statement might

have implicated the taller woman (and thus not Mulero) as the shooter of the second victim outside the rest-room, but that Serrano's statement was not definitive on whether Mulero or the taller woman had done the second shooting. Lynch also testified that he had reviewed the various police reports, including reports by two different officers which contained conflicting stories from Rodriguez—one which stated that Mulero had shot one of the victims and the other which indicated that Montanez had shot both victims. Lynch further stated that the State had made no plea offer and refused to participate in a pre-trial plea conference.

Additionally, Lynch testified that when he met with Mulero in August 1993, Mulero directed him to enter a guilty plea on her behalf. Lynch stated that he was sur-prised by Mulero's request and told her to think about it. He also explained that he did not want to discuss a plea at that time because Mulero's request at this meeting came directly on the heels of Montanez's recent con-viction and following the court's previous denial of Mulero's motion to suppress. Lynch added that he also wanted to think more about such a strategy.

When they next met, Lynch and Mulero discussed for about an hour the pros and cons of entering a blind plea of guilty. Lynch noted the risk in entering such a plea was that Mulero could be sentenced to death. But he also noted that there might be an advantage in pleading guilty because it might convince the jury to spare Mulero's life because it could show that, after having had time to think about her actions, Mulero was

truly remorseful. And thus her plea would offset the negative impression naturally flowing from the news videotape which showed Mulero as proud of her actions. Lynch testified that in addition to discussing the pros and cons in general, he also discussed the strength of the case against Mulero and the weight of the evidence. Lynch explained that the discovery and other evidence included: Mulero's court-reported confession and her claims of coercion, Montanez's confession, the videotape evidence, Rodriquez's statements—including the conflicting aspects of those statements concerning whether there was one shooter or two—Serrano's eyewitness account, and the Public Defender's investigator's statement that Serrano may have implicated the taller woman as the shooter of the second victim. Lynch stressed that he did not tell Mulero one way or the other what to do—as he said, he made no recommendation "whatsoever" about whether Mulero should plead guilty. Rather, as Lynch explained, after discussing the evidence with her, Mulero decided on her own that she wanted to plead guilty.

Mulero also testified at the hearing on her motion to withdraw her guilty plea. *People v. Mulero*, 680 N.E.2d 1329, 1345 (Ill. 1997). She testified that it was Lynch's idea for her to plead guilty and that she pleaded guilty because trial counsel did not give her "much of a choice." *Id.* In addition, in support of her motion to withdraw her guilty plea, Mulero presented the testimony of a psychologist, Michael Kovar. *Id.* Dr. Kovar testified that he conducted several psychological tests on Mulero, which showed that she was highly suggestible and easily

misled. *Id.* He further concluded that Mulero had de-
ficiencies in "the 'fund' of information, vocabulary, and
commonsense reasoning." *Id.* And "[b]ased on his test
findings, her mental status, her history and her overall
presentation, Dr. Kovar concluded that [Mulero's] plea
of guilty was not knowingly and intelligently made,
given defendant's lack of competence at the time she
pled guilty." *Id.* Dr. Kovar further diagnosed Mulero
as "having a depressive disorder, a general anxiety disor-
der, and presently manifesting borderline intellectual
functioning." *Id.*

The state trial court denied Mulero's motion to with-
draw her guilty plea on December 7, 1994. The state
court found Dr. Kovar's testimony not credible, noting he
was "not a psychiatrist" and "not a medical doctor." The
judge then elaborated on his reasons for rejecting
Dr. Kovar's testimony and Mulero's motion to with-
draw her guilty plea, stating:

> [Dr. Kovar] suggests to this Court that he knew what
> her mental state was and her suggestability when
> she had conversations with her lawyer and when
> she pled guilty in front of me, and I recall it very, very
> well and I have an advantage on some of the parties.
> I was here for these proceedings. And I was also
> here when Mr. Jeremiah Lynch tried the case. I found
> him to be a very professional, credible, excellent
> lawyer, probing cross-examination, conducted him-
> self in an extremely credible manner. He hasn't been
> here in the last few days to see his reputation and
> his ability besmirched, but I believe him and I heard

him testify relative to this motion and he was an extremely credible, straightforward, truthful witness. And he said one key thing. That Marilyn Mulero it was her idea to plead guilty, not his, and her idea to plead guilty came after she lost a motion to suppress the court reporter [sic] confession in which she admitted the offense and after her co-defendant Jacqueline Montanez, also known as Loco, was found guilty in about half an hour on the same evidence. She suggested to Jeremiah Lynch that if she were to plead guilty what would that mean, and she had numerous discussions on the pros and cons of pleading guilty. . . . [S]he knew that there was testimony from a newsreel in a videotape taken by one of the media in which after the statement she and Montanez come [sic] out of a room and cockily wearing gang clothes, giving gang signals so to show no remorse whatsoever, and they discussed and Mr. Lynch testified to this, what the advantage would be to plead guilty, and that would be that she would show the jury that she had remorse for what she did because it was almost a foregone conclusion that she did it and perhaps that would be in her benefit to plead guilty. . . . That was her choice. She entered that plea in front of me. She was admonished as to what the penalties were, what her rights were. She indicated to me that she understood and I believed her, and I've been talking to defendants for a long time, that she did it knowingly, voluntarily and intelligently. And she also did it after numerous, numerous conversations with her

attorney. And it was a remarkable decision at the time. There were advantages to it. Her perceived advantages. They didn't work out that way but at the time she did it she did it from an intelligent, informed viewpoint that perhaps this was the best way to go. And there's no question that Mr. Lynch in my view, and this is the only case he tried in front of me, but the way he conducts himself as a competent attorney. That's what lawyers are for. He told her the pros and the cons. He didn't tell her you got to go this way. She's the one that made that decision. And I'll tell you why I know that. Because Lynch said it and I believe him, but more importantly, she said it. In front of the jury after taking the same oath that she took here today and proceeded to lie. Her motion to withdraw the guilty plea is denied.

After Mulero lost her motion to withdraw her guilty plea, she appealed the denial to the Illinois Supreme Court, arguing that the trial court erred in ruling that Dr. Kovar's testimony was not credible based solely on the fact that he was a clinical psychologist and not a medical doctor. *Mulero*, 680 N.E.2d at 1344. The Supreme Court rejected Mulero's challenge to the state court's ruling on her motion to withdraw her guilty plea in *Mulero*, holding that although the court had "improperly commented about [Dr. Kovar] not being a medical doctor or a psychiatrist, [t]he record, however, demonstrates that the trial judge did not reject Dr. Kovar's credibility because he was not a medical doctor or a psychiatrist. Rather, the trial judge did not

agree with Dr. Kovar's conclusions because of his own observations of defendant while presiding over the proceedings in this case, and because he found [Lynch] to be credible." *Id.* at 1345. The Supreme Court then concluded that "the trial judge properly rejected Dr. Kovar's credibility in light of other evidence" and found there was no basis for granting a new hearing on the motion to withdraw Mulero's guilty plea. *Id.* at 1341. While Mulero lost her challenge to the denial of her motion to withdraw her guilty plea, she prevailed on her challenge to her death sentence. The Illinois Supreme Court overturned her death sentence, holding that the trial court had erred in allowing the prosecution to introduce into evidence Mulero's motion to suppress—either for substantive or impeachment purposes at sentencing. *Id.* at 1340. The Supreme Court then remanded the case for a new sentencing hearing. *Id.*

At the second sentencing hearing, Mulero's new attorney, in arguing in favor of life imprisonment, suggested that Mulero did not really shoot Cruz, although he acknowledged that she was nonetheless legally accountable for the murders under Illinois law. The second jury sentenced Mulero to life imprisonment without possibility of parole. Mulero's Public Defender filed an *Anders* brief, and the state appellate court affirmed Mulero's life sentence, holding there were no arguable issues for appeal. *See People v. Mulero*, No. 1-99-0825 (Ill. App. Ct. 1999). Mulero did not file a Petition for Leave to Appeal to the Illinois Supreme Court.

Mulero then filed four separate versions of a state postconviction petition between 1996 and 2006. In these

petitions, she alleged that her trial attorney, Lynch, was ineffective in numerous ways. Each petition included some overlap, but also made slightly different claims. The state trial court denied her petitions for post-conviction relief and Mulero appealed to the Illinois appellate court, which affirmed. The Illinois Supreme Court then denied Mulero leave to appeal.

After the state courts denied Mulero's claims of ineffective assistance of counsel, she filed a petition for habeas corpus in federal district court, again alleging ineffective assistance of trial counsel from Lynch. She alleged numerous supposed deficiencies, but the district court found many of the claims procedurally defaulted and rejected the remaining claims. The district court then issued a certificate of appealability limited to two issues: 1) whether Lynch's limited investigation into the facts of the murders, particularly his admitted failure to interview any witnesses, constitutes ineffective assistance of counsel; and 2) whether Lynch's failure to procure any supporting services, including experts or investigators, in violation of ABA death penalty case Guidelines, constitutes ineffective assistance of counsel. Mulero appeals.

II.

As noted, the district court certified two issues for appeal, the first concerning Lynch's failure to investigate and the second concerning his failure to obtain supporting services. In her brief on appeal, Mulero presents ten different alleged deficiencies by Lynch related to his claimed unconstitutional failure to investigate and

failure to obtain supporting services.[1] The government responds that Mulero has procedurally defaulted on all but three issues. We agree.

To preserve a federal claim for habeas review:

> [i]f the claim comes from the Illinois state courts, the petitioner must have presented each claim in the habeas petition to the Illinois Appellate Court and to the Illinois Supreme Court in a petition for discretionary review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). As part of this requirement, a petitioner must have fairly presented both the operative facts and legal principles that control each claim to the state judiciary. *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001). A petitioner's failure to fairly present each habeas claim to the state's appellate and supreme court in a timely manner leads to a default of the claim, thus barring the federal court from reviewing the claim's merits. *O'Sullivan*, 526 U.S. at 848.

*Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010).

---

[1] Specifically, Mulero argues that Lynch was ineffective because he did not 1) interview witnesses; 2) discover key impeachable evidence; 3) use a key witness's contradictory statement; 4) investigate the crime scene; 5) investigate bullet angulation evidence; 6) reasonably consult with Mulero; 7) meaningfully consult with the prior lawyer who worked on Mulero's case; 8) consult with co-counsel; 9) attend conferences or seminars to educate himself on how to effectively represent Mulero; and 10) consult with a mitigation expert to prepare himself for the sentencing phase of Mulero's trial.

In this case, as the government correctly points out, Mulero only presented three of the claimed deficiencies through one complete round of state court review. Mulero does not really argue otherwise; instead she merely counters that the district court concluded that she had preserved all issues related to Lynch's failure to investigate witnesses and failure to obtain supporting services. *See* Petitioner's Reply Brief at 5-7. But "we review a district court's procedural default ruling de novo." *Ward v. Jenkins*, 613 F.3d 692, 696 (7th Cir. 2010). Thus, we owe no deference to the district court's view of default, but rather review the state court record with fresh eyes. We have done so and, in fact, Mulero only presented three claimed deficiencies through one round of Illinois review. Specifically, Mulero argued to the Illinois appellate court that Lynch was ineffective because he did not: 1) discover that Serrano claimed to have seen the taller woman shoot Cruz; 2) obtain psychological evidence to support an argument that Mulero's confession was involuntary; and 3) recognize that he could call into question the only real remaining evidence against Mulero—Rodriguez's statements—based on inconsistencies in her statements and bias. Brief and Argument of Petitioner-Appellant to Illinois appellate court at 10-17. While Mulero did present numerous other claims of ineffective assistance of counsel to the Illinois state trial court and in her petition for review to the Illinois Supreme Court, those other claims were not developed in her briefs to the Illinois appellate court challenging the denial of her petition for post-conviction review. Accordingly, only

the three issues noted above are preserved for our habeas review.[2]

For the three preserved issues, our habeas review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). "Under the AEDPA, a petitioner for habeas relief must establish that the state court proceedings resulted in a decision that (1) was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court'; or (2) was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" 28 U.S.C. § 2254(d)(1)-(2).

In her habeas petition, Mulero challenged her state court conviction based solely on § 2254(d)(1) and then based only on the "unreasonable application" prong of (d)(1). Under the "unreasonable application" clause, habeas relief is appropriate "if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *McCarthy v. Pollard*, 656 F.3d 478, 483 (7th Cir. 2011) (internal quotation omitted). Importantly, "[t]he focus of the reasonableness inquiry is on

_____

[2] While on appeal Mulero makes passing reference to her innocence, she does not argue that her default should be excused because of cause and prejudice or a fundamental miscarriage of justice, and accordingly there is no basis to excuse her default. *See Promotor v. Pollard*, 628 F.3d 878, 887 (7th Cir. 2010).

whether the state court's application of clearly established federal law is *objectively unreasonable,* not whether it applied clearly established federal law correctly." *Id.*

The federal law at issue here is *Strickland v. Washington,* 466 U.S. 668 (1984), which governs ineffective assistance of counsel claims. Under *Strickland*'s familiar two-part test, an attorney renders ineffective assistance of counsel if 1) the attorney's performance fell below "an objective standard of reasonableness," *id.* at 688, and 2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "To satisfy *Strickland* in the context of a guilty plea, a petitioner must show that counsel's advice regarding the plea was objectively unreasonable and that there is a reasonable probability that but for counsel's error, [petitioner] would not have pled guilty, but would have insisted upon a trial." *Ward*, 613 F.3d at 698.

The Supreme Court in *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), explained that "the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective assistance challenges to convictions obtained through a trial." *Id.* at 59. The Court gave the following example:

> [W]here the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led

counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

*Id.*

With these principles in mind, we turn to Mulero's three ineffective assistance of counsel arguments. Initially, we note that the Illinois state trial court did not address the first prong of *Strickland*. In other words, the state court never determined whether Lynch's guidance in advising Mulero concerning her desire to enter a blind plea fell below "an objective standard of reasonableness." Because the state court did not address this question, our review would be *de novo*. *Sussman v. Jenkins*, 636 F.3d 329, 350 (7th Cir. 2011). But we need not reach that question because, as discussed below, Mulero cannot establish that the state court's conclusion that she did not suffer prejudice was unreasonable.

First, Mulero argued that Lynch was ineffective for failing to investigate Serrano and to obtain from Serrano a statement that she had seen the taller woman (i.e., Montanez) shoot Cruz. In support of this argument, Mulero pointed to affidavits sworn by an investigator and an intern, in which they stated that on July 17, 1997, Serrano informed them that she saw the taller of the three women walk behind Cruz and shoot him. While it is true that Lynch did not speak with Serrano or hire an investigator to do so, the Public Defender from whom Lynch took over the case had hired an investigator. Lynch knew that the investigator had concluded that

Serrano's statement indicated that she might have seen the taller woman shoot the man outside the restroom. But Lynch also determined that Serrano's statement was not definitive. Lynch testified that he spoke with Mulero about the inconsistencies in Serrano's statements and that she nonetheless wanted to plead guilty. And the state court found Lynch's testimony credible. Given that Lynch and Mulero already knew of the inconsistencies in Serrano's eyewitness reports based on a report by an investigator hired by Mulero's original attorney, there are no reasonable grounds to believe that further investigation would have changed Lynch's advice about entering a blind plea or Mulero's decision to enter such a plea. Nor is there any reason to believe that obtaining another out-of-court statement from Serrano would have altered the strength of the case against Mulero: Notwithstanding Serrano's supposed statements in 1997 to an investigator and intern hired by Mulero's latest attorney that the taller woman shot Cruz, Serrano testified at Montanez's re-trial in November 1999[3] that one of the shorter women was the second shooter.[4]

---

[3] Montanez's 1993 conviction was overturned in *People v. Montanez*, 652 N.E.2d 1271, 1274 (Ill. App. 1995). Following a second jury trial in November 1999, Montanez was again convicted of the murders and sentenced to life imprisonment.

[4] As we explained in *Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000), there may be many reasons why a witness would tell a defendant's friends or attorney what they want to hear: "the formality of a court, the presence of the litigants, and the

(continued...)

Mulero's second claimed deficiency—that Lynch failed to obtain psychological evidence to support an argument that Mulero's confession was involuntary—fares no better. In his motion to suppress, Lynch argued that Mulero's confession was psychologically coerced, but the state court rejected this argument. Lynch also testified that he discussed making a coerced-confession argument with Mulero, but he doubted it would succeed given her boastful display to the television cameras following her confession. Moreover, the psychological evidence later obtained from Dr. Kovar was rejected as not credible by the state trial court and the Illinois Supreme Court found that in light of the other evidence, the trial court had properly rejected Dr. Kovar's credibility. Additionally, the assistant state's attorney for Cook County to whom Mulero confessed testified at her sentencing hearing that during her confession Mulero was very calm and in control of herself and did not indicate any remorse for her actions. He added that it appeared that Mulero was very proud of what she had done. This testimony also would negate a coerced-confession argu-

---

[4] (...continued)

gaze of a judge induce witnesses to hew more closely to the truth than they do when speaking in private and attempting to appease the losing side's advocate"; "[s]ome witnesses fall prey to influences—perhaps the persuasive influence of a skilled advocate asking leading questions, perhaps the less wholesome influence of the defendant's friends. . . . People fear the Latin Kings for a reason." Or, as in this case, the Maniac Latin Disciples.

ment. Under these circumstances, the state court did not act unreasonably in concluding that had Lynch obtained additional psychological evidence, it would not have changed his advice or convinced Mulero to change her mind about entering a blind plea of guilty.

Finally, Mulero argued to the state court that Lynch should have recognized that he could call into question the only real remaining evidence against Mulero—inconsistencies in Rodriguez's statements and bias. Specifically, Mulero pointed to contradictory statements by Rodriguez—statements indicating that Mulero shot one victim and Montanez the other, and another statement indicating that Montanez shot both victims. Mulero also stressed that Rodriguez gave her statements to officers only after having been arrested for drug offenses. Lynch, though, testified that he had reviewed the Public Defender's file and discovery and knew of the inconsistencies in Rodriguez's police statements, and that he also knew that she was in custody on drug charges at the time she implicated Mulero. Lynch further stated that in discussing a potential guilty plea with Mulero, he discussed the case she was facing and the discovery evidence. Thus, there is no reason to believe that Lynch did not recognize that he could challenge Rodriguez's testimony if Mulero pleaded not guilty and proceeded to trial. There is also no reason to believe that had Lynch independently confirmed the inconsistencies, Mulero's decision to enter a blind plea would have changed. Nor is there any reason to think that additional investigation of Rodriguez would result in Mulero's acquittal if she had decided to plead not guilty.

In the end, what we have is an overwhelming prosecutorial case against Mulero, which included: Mulero's own confession to police and an assistant state's attorney; her post-confession behavior captured on camera; Montanez's confession implicating Mulero; Serrano's statements implicating Mulero; and Rodriguez's statements of the trio's statements before and after the shooting. Lynch could have attempted to call into question this evidence at trial, but he advised Mulero of the evidence and the pros and cons of pleading guilty and she nonetheless decided to plead guilty. Further investigation would not have added anything to this assessment. Moreover, the inconsistencies in Serrano's and Rodriguez's prior statements, which Mulero points to as evidence that she did not shoot Cruz, do not help Mulero because under Illinois law, Mulero was accountable whether or not she pulled the trigger—the only difference being whether she qualified for the death penalty. Under these circumstances, even if Lynch's performance was objectively unreasonable because he did not recommend against a blind guilty plea in light of the inconsistencies in Serrano's and Rodriguez's testimony, it is not reasonable to believe that Mulero suffered any prejudice. Rather, the best that Mulero could hope for is what she got—life in prison and not the death penalty.[5]

---

[5] Finally, we note that Mulero, in passing, requests that this court remand her case for a hearing, should this court not find habeas relief appropriate. Mulero did not develop this argument, however, so it is waived. In any event, Mulero is not

(continued...)

### III.

Nearly twenty years ago, Mulero pleaded guilty in Illinois state court to two counts of murder and received a sentence of life imprisonment. Even assuming her attorney was deficient in failing to further investigate inconsistencies or a motive to lie in statements by two witnesses, or was deficient in failing to obtain psychological or IQ evidence to challenge Mulero's confession, the state court did not err in concluding that Mulero suffered no prejudice. The evidence against Mulero was overwhelming and there is no reasonable likelihood that, in light of this overwhelming evidence, any further investigation would have convinced Mulero to instead plead not guilty and then alter the outcome of the proceedings, i.e., her conviction on two counts of murder and life sentence. Accordingly, Mulero is not entitled to habeas relief. We AFFIRM.

---

[5] (...continued)
entitled to a hearing. AEDPA governs the availability of evidentiary hearings on federal habeas review, and generally bars them except in narrow exceptions inapplicable to Mulero. *See* 28 U.S.C. §§ 2254(e)(2)(A), (B).