In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3059

ERIC BLACKMON,

*Petitioner-Appellant,*

*v.*

TARRY WILLIAMS,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 2358 — **Ronald A. Guzmán**, *Judge.*

ARGUED OCTOBER 2, 2015 — DECIDED MAY 24, 2016

Before POSNER, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal from the denial of a habeas corpus petition presents a thicket of procedural and substantive issues arising from a murder on the streets of Chicago. On the Fourth of July in 2002, Tony Cox was standing outside a restaurant when he was gunned down by two men. The gunmen fled, but two women driving cars near the scene saw the murder and the shooters' faces. Not quite two months

later, both women independently chose petitioner Eric Blackmon's photograph out of arrays, identifying him as the second shooter. They repeated those identifications at a live line-up and then again at trial. Primarily on the strength of their testimony, Blackmon was convicted of first-degree murder and sentenced to sixty years in prison.

Blackmon petitioned the state courts for post-conviction relief, arguing that his attorney was constitutionally ineffective because he failed to present certain eyewitness and alibi testimony, and in the alternative, that he was actually innocent. The state courts summarily denied relief. Blackmon then sought relief in federal court under 28 U.S.C. § 2254. The district court denied Blackmon's petition.

The record before us supports the conclusion that Blackmon's trial counsel was constitutionally ineffective by failing to investigate the alibi witnesses and shows that the state court's summary dismissal of the claim was unreasonable. But a "state court's mistake in summarily rejecting a petition, *i.e.*, without fully evaluating conflicting evidence on disputed factual issues, does not necessarily mean the petitioner is ultimately entitled to relief." *Mosley v. Atchison*, 689 F.3d 838, 842 (7th Cir. 2012). Because of that summary dismissal, the alibi witnesses have not yet been tested in any sort of adversary proceeding, and the record contains no evidence from Blackmon's trial counsel as to what he did or did not do. Accordingly, we vacate the denial of the habeas petition and remand to the district court to assess whether Blackmon "is actually 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Id.*, quoting 28 U.S.C. § 2254(a).

I. *Background*

A. *The Murder of Tony Cox*

At about 4:30 p.m. on July 4, 2002, Tony Cox was shot and killed in front of a restaurant called Fat Albert's located at 1143 South Pulaski Road in Chicago. Though the various accounts of the shooting differ in some ways, the basic outline is relatively consistent, with one exception discussed below.

At the time of the shooting, Cox and Richard Arrigo, the owner of Fat Albert's, were outside the restaurant with two other men. The first assailant shot Cox at least twice, and Cox fell to the ground. The second assailant then shot Cox twice more, and both men fled. The State's theory is that Blackmon was the second shooter. Cox died from four bullet wounds to the head, each of which would have been fatal alone. The medical examiner recovered two bullets from Cox's body, and a forensic scientist with the Illinois State Police later testified that those bullets had come from two different guns.

Frencshun Reece and Lisa McDowell, the witnesses who would later form the core of the State's case, saw Cox's murder from their respective vehicles. Reece was stopped at a red light when she saw the first assailant shoot Cox twice. According to Reece, both assailants began to flee, but the second assailant turned back and shot Cox in the head again before running away. Reece pulled over and called the police, although Arrigo urged her to hang up and claimed he had already called. Reece remained at the scene to speak with police. Later that day, she viewed a photographic array and selected three pictures that "resembled" one or both of the assailants, though she made no definitive identification that day. Blackmon was not part of this first photo array.

McDowell was driving south when she stopped at a red light, about two car-lengths back from the intersection. She did not see the first two gunshots, but she looked over after hearing them and saw Cox lying on the ground, with Arrigo standing nearby. She then saw the two assailants approach Cox. One of them shot him twice more, and both men fled. McDowell also called 911 but did not remain at the scene, and she did not view photographs of possible suspects that day.

Arrigo, too, witnessed the crime. According to his account, he was locking the doors of his restaurant when he heard two gunshots. He turned and saw the second assailant shoot Cox twice and flee with the first. Like Reece, Arrigo remained at the scene and spoke to police, but he told them he had not recognized the shooters and could not identify them.

B.  *The Investigation*

A few days into the investigation, a possible explanation for the shooting began to emerge. George Davis, also known as "Booney Black," was the founder of the New Breed gang, of which Cox was a member. According to an "Investigation Time-Line" produced during discovery, police received a tip indicating that Davis had lent Cox money to start a drug corner but had ordered him killed when things went badly. There was also evidence suggesting that Arrigo, who was Davis's friend, helped arrange the murder. The investigators found a message from Arrigo on Cox's voicemail instructing Cox to meet him at the restaurant. Arrigo confirmed it was his voice on the recording but claimed not to remember leaving the message, and he denied arranging the murder. Cell phone records also showed that Arrigo had called Davis immediately after the shooting.

Police also received information that two individuals nick-named "Pride" and "Keno" may have killed Cox. "Keno" was the nickname of Michael Davis, the nephew of George Davis; "Pride" was the nickname of a man named Eric Bridges, who, like Cox, was a member of the New Breed gang.

At some point, the police began to focus on Eric Blackmon instead, though the record does not show how he became a suspect. The "Investigation Time-Line" mentions "Pride" and "Keno" but does not even mention Blackmon (whose nick-name is or was "Forty"). The rest of the record provides little additional insight. A detective testified during grand jury pro-ceedings that Blackmon and Cox were "members of the same street gang," but the State's counsel conceded at oral argu-ment that no trial evidence supports this assertion. There was also testimony at trial that "family members" had verified Blackmon was "involved" in the murder, but the detective did not explain further and the "Investigation Time-Line" does not mention them.

Regardless, Blackmon did come under suspicion, and his picture was placed in a photo array that Reece, McDowell, and Arrigo all viewed in late August or early September, about two months after the shooting. Arrigo did not identify anyone from the photo array as one of the shooters. Reece and McDowell, however, both selected Blackmon's photograph. A live line-up yielded the same results: Arrigo did not identify anyone, while both Reece and McDowell chose Blackmon, who was arrested and charged with Cox's murder.

C. *Blackmon's Trial*

At a bench trial in September 2004, the State presented the testimony of McDowell and Reece to prove that Blackmon

was the second shooter on July 4, 2002. McDowell testified that she was stopped in traffic on South Pulaski Road when she heard a gunshot. When she looked to her left, she saw "an Italian guy"—that is, Arrigo—and then watched as two men came around a building. One of the men, she testified, stood over a body lying on the sidewalk and then fired two more shots at the victim. She described that shooter as a black male, a "tall guy, maybe about six feet, slender build." She testified that she saw the gunman's face and identified Blackmon in court as the man she saw.  McDowell said she had seen the shooter from about fifteen to sixteen feet away, and that after firing, both the shooter and the other man had run across Pulaski Road.

On cross-examination, Blackmon's counsel tried to undermine the reliability of McDowell's identification. For example, he elicited testimony that she had seen the shooter's face straight-on for only about five seconds. McDowell also testified that as she watched the shooter running away, she had only a view of his profile in her car's rearview mirror from about forty-five feet away. Counsel also emphasized that McDowell had not viewed the photo array until weeks after the incident, and he sought to draw out discrepancies in her testimony as compared to her previous statements. Nevertheless, McDowell did not waver on her identification.

Reece testified that she was stopped at a red light on Pulaski Road when she noticed a group of four men, three black and one white, gathered outside Fat Albert's. She said that she had heard a noise she initially believed to be firecrackers. Then, she said, she saw one of the black men pull out a gun and shoot toward Cox's head. Cox went down on his hands and knees, and when he tried to rise, the first man shot him

again "in his neck." Reece testified that both assailants then "took off running," but the second assailant returned, "came very close" to the victim, "pointed the gun directly into his eye," and shot him. The second assailant then looked up at Arrigo, "shook his head," and fled. Like McDowell, Reece identified Blackmon in court as the second shooter.

Reece testified that she pulled over, called the police, and waited at the scene until they arrived. Several hours later, she went to the police station and viewed a photo array (the one without Blackmon's picture). She testified that she did not "really" identify anyone then but admitted saying some of the photos "looked familiar." According to the officer who administered the photo array, Reece also selected a third picture depicting a subject who had a hairstyle similar to one of the shooters. Near the end of August, Reece viewed another photo array, this time with Blackmon's picture included. She testified that she had identified Blackmon as the second shooter from July 4 after viewing the second array based on the "bone protrusion" she could see through his shirt. On cross-examination, she elaborated that she had also identified Blackmon because he had "braids in his hair" and because he "looked like Michael Jackson."

As he had with McDowell, Blackmon's attorney attempted to discredit Reece's identification. Reece said that she had seen the shooting from about 130 feet away (though she testified that at some point she began driving, getting "so close that I can hit them with my car") and had seen the second shooter's face close up for only three seconds. The attorney also pointed out that the men in the photos Reece had selected on July 4 did not look like Blackmon, although Reece maintained that she had chosen two photos that both resembled the *first*

shooter, not the second. Blackmon's attorney also attacked Reece's identification by cross-examining Detective Gregory Jones, who administered the July 4 photo array. Jones testified that Reece had never said the second shooter looked like Michael Jackson, nor had she pointed out his bone structure. He also testified that Reece had not chosen two photographs that resembled the first shooter, as she claimed, but had in fact chosen two photographs "that resembled two of the individual offenders"—helpful to Blackmon because Reece conceded that neither subject resembled Blackmon.

Blackmon's defense consisted of both alibi testimony and competing eyewitness testimony. To support his alibi, he offered testimony from two witnesses, Tomeka Wash and Selena Leavy. Wash testified that on July 4, 2002, she had hosted a barbecue in the lot across the street from her home. At about 1:00 p.m., she had seen Blackmon at the barbecue firing up the grill, and by 2:00 p.m., between twenty and forty people had arrived at the picnic, with guests coming and going throughout the afternoon. About half an hour before the murder took place, Wash said, Blackmon was still at the picnic playing chess and barbecuing. She said that she stayed until 10:00 p.m. that night and never saw Blackmon leave. According to Wash, she was close to Blackmon throughout the picnic and could see him "all the time."

Leavy testified that she attended the same barbecue, arriving about 2:45 or 3:00 p.m. When she arrived, she saw Blackmon at the barbecue cooking and she said that at approximately 4:00 p.m., Blackmon had fixed her a plate of food. She also said that between 3:00 and 4:00 or 4:30 p.m., Blackmon was at the picnic playing dominos or chess with his friends and that he never left the barbecue at any time between her

arrival and her departure around 8:00 p.m. Finally, she testified that Blackmon's car did not leave the barbecue, either: the attendees had been using its radio for music and so presumably would have noticed if someone had driven it away.

On cross-examination, the prosecution brought out that Wash had two felony convictions and that Leavy was Blackmon's cousin. The prosecution also emphasized that two years had passed since the barbecue; that Wash and Leavy claimed, somewhat improbably, to have kept Blackmon continuously in their sight for hours; and that guests had been coming and going throughout the picnic, presumably making it less likely that either woman could have kept track of a single guest without interruption.

In addition to the two alibi witnesses from the barbecue, the defense presented testimony from a competing eyewitness to the murder, Terrance Boyd. He testified that on July 4, 2002, he and Cox planned to go drinking together. When he arrived on Pulaski, he saw Cox standing in the street and spoke with him. Boyd said that another man named "Booney" was also present, as was Eric Bridges. According to Boyd, Cox said he needed to talk to Eric, so Boyd walked away and turned the corner into an alley. He then heard gunshots and peered around the corner, where he saw Bridges shooting Cox. Boyd testified that he "trotted away," fearing for his own safety, but returned once Bridges left the scene. He repeated that "Booney" had been present but initially did not remember seeing anyone else there. Later, Boyd said there may have been another "black person" present "at the curb, maybe coming from across the street," but that he did not know who it was. He never mentioned Arrigo.

On cross-examination, Boyd acknowledged his multiple prior convictions, including one for perjury. He admitted that he first came forward with his account of the shooting two years after the fact when he was seeking to "work a deal" with the U.S. Attorney in a federal case. The prosecution also emphasized the flaws in Boyd's story. For example, Boyd testified he and Cox had been friends for ten years, but Boyd never checked on Cox after the shooting. Boyd also said that "Booney" ran away during the shooting, but the prosecution introduced testimony that George Davis had an "apparent disability with his left leg" and that he had "a hard time walking." Further, Boyd testified that he had seen only Eric Bridges shoot Cox, but the other eyewitnesses described two shooters, and ballistics evidence showed that two different weapons were used.

The judge found Blackmon guilty of murder. He summarized the testimony and evidence before making explicit credibility determinations about the witnesses. He found McDowell and Reece credible and persuasive because they expressed confidence in their identifications, withstood extensive cross-examination, and told consistent stories despite having had no contact with one another. The judge rejected Boyd's alternative version of the shooting, finding that his testimony had "less than zero credibility."

The judge also rejected Blackmon's alibi, finding Wash's and Leavy's stories to be highly unrealistic. He also noted that Wash's credibility was undermined by her felony convictions, her testimony that she hosted the barbecue but knew only "the defendant and two other people," and the fact that Leavy claimed to have spoken to Wash at the barbecue but Wash did not remember her being present. The judge also pointed out

that Leavy's family ties to Blackmon were revealed only on cross-examination, calling that fact "interesting." Based on his assessment of the evidence, the judge found Blackmon guilty of first-degree murder. He sentenced Blackmon to sixty years in prison. The conviction and sentence were affirmed on direct appeal.

D. *Collateral Proceedings*

1. *State Post-Conviction Proceedings and the Discovery of New Witnesses*

Blackmon then petitioned for state post-conviction relief. He claimed his trial counsel provided ineffective assistance by: (1) failing to investigate and call additional alibi witnesses from the barbecue; and (2) failing to call Arrigo as a trial witness. The state court summarily dismissed the petition, holding that the alibi witnesses' testimony would have been cumulative, and that whether to call a witness like Arrigo was a matter of trial strategy.

The Illinois Appellate Court affirmed. First, it found that Blackmon's evidence did not demonstrate actual innocence, which in Illinois means total vindication or exoneration of the defendant. *People v. Williams*, 914 N.E.2d 641, 651 (Ill. App. 2009). The court also agreed with the trial court that the alibi witnesses' testimony would have been cumulative and held that neither that testimony nor Arrigo's testimony was newly discovered, as required to state an actual innocence claim. See *People v. Ortiz*, 919 N.E.2d 941, 950 (Ill. 2009). Finally, the appellate court agreed with the trial court on the merits of the ineffective-assistance claims. It held that decisions regarding which witnesses to call are usually strategic and saw "no reason to set aside the usual deference to counsel's trial strategy

under such circumstances … ." The court did not separately address the failure to investigate those witnesses. The Supreme Court of Illinois denied Blackmon's petition for leave to appeal.

Blackmon later discovered additional witnesses helpful to his case: Latonya Thomas and Lajuan Webb, who were both employees of a barber shop adjacent to the crime scene. Both were working the day of the shooting and signed affidavits with their observations of that day.

Thomas swore that on July 4, 2002, she was working when her attention was drawn to the street outside by what she believed to be fireworks. As she looked through the window, she saw the victim fall to the ground, and a man stepped into her line of sight and shot the victim as he tried to rise. At that point, Thomas crouched beside a chair but could still see what was going on outside. She said that she saw a second man whom she knew as "Pee" approach the victim and shoot him "several more times." Both men then fled north. Thomas acknowledged that she had not previously spoken to the police but said she had feared for her safety. She was adamant that she could identify the shooters because she had "seen them both hanging out on the street around the salon countless times." She testified that neither man was Blackmon, whom she has never met.

Webb swore that on July 4, 2002, he was also working when he heard five or six gunshots outside. He then saw two black men with guns run past the shop. Webb, too, said he had seen both gunmen in the neighborhood before the shooting and that neither one was Blackmon. Webb said he gave his name to a police officer who came to investigate the shooting, but no one ever contacted him for questioning.

Based on these exculpatory affidavits, Blackmon sought leave to file a successive post-conviction petition in state court, arguing that Webb's and Thomas's testimony supported his actual innocence claim. He also re-asserted his claim that his counsel was ineffective for failing to call Arrigo at trial. The state trial court denied his request, and Blackmon appealed.

The Illinois Appellate Court affirmed again. *People v. Blackmon*, No. 1-11-1908, 2013 WL 2145922 (Ill. App. May 14, 2013). It noted that Illinois law ordinarily contemplates only one post-conviction proceeding, but a showing of either cause and prejudice or actual innocence could overcome that bar. *Id.* at *5. "Where defendant seeks to relax the bar against successive post-conviction petitions on the basis of actual innocence, leave of court should be denied only where it is clear from a review of the successive petition and supporting documentation that, as a matter of law, defendant cannot set forth a colorable claim of actual innocence." *Id.*, citing *People v. Edwards*, 969 N.E.2d 829, 836 (Ill. 2012). To establish a claim of actual innocence under Illinois law, a defendant must present evidence that is newly discovered, material, and not merely cumulative, and of such conclusive character that it would probably change the result on retrial. *Id.* The court concluded that the affidavits of Webb and Thomas could have been obtained long ago, stating that "any reasonable investigation would have included inquiries as to who was working at the salon at the time of the shooting" and that there "was no apparent obstacle to obtaining this information." *Id.* at *6.

The court also held that Blackmon had not raised "the probability that it is more likely than not that no reasonable

juror would have convicted defendant in light of the new evidence," concluding he had not set forth a colorable actual innocence claim. *Id.* at *7. The court focused on the following facts: (1) both Webb and Thomas waited nearly eight years to disclose their observations of the shooting; (2) Thomas viewed the incident while crouched behind a chair; (3) Thomas merely contradicted the credible testimony of McDowell and Reece; and (4) Webb did not even see the shooting take place. *Id.* at *6–7. Finally, the court rejected on *res judicata* grounds the claim that counsel should have called Arrigo to testify. *Id.* at *7. The Supreme Court of Illinois denied Blackmon's petition for leave to appeal.

### 2. *Federal Habeas Corpus Proceedings*

While the state courts were still considering Blackmon's request to file a successive post-conviction petition, Blackmon filed a petition for a writ of habeas corpus in federal court. He asserted three distinct grounds for relief. Two were theories of ineffective assistance of counsel based on the failure to present Arrigo's testimony and the failure to investigate and call additional alibi witnesses. The third was a claim of actual innocence based on newly discovered evidence—that is, the Webb and Thomas affidavits.

The federal court held his petition in abeyance pending resolution of the state post-conviction proceedings. The petition was briefed after the state court proceedings ended, with Blackmon filing a supplemental memorandum that expanded on his earlier-asserted claims. The memorandum also suggested for the first time that his claim of actual innocence was meant not as a stand-alone ground for relief but as a "gateway claim" to an otherwise-defaulted theory of ineffective assistance of counsel and a violation of *Brady v. Maryland*, 373 U.S.

83 (1963).[1] Turning to the merits of those defaulted claims, Blackmon argued that his trial counsel was constitutionally ineffective by failing to conduct an adequate investigation of businesses near the crime scene, which would have led him to the exculpatory testimony of Webb and Thomas.

When the State filed its response to Blackmon's § 2254 petition, it ignored the memorandum and Blackmon's new characterization of the actual innocence claim as a "gateway" to an ineffective-assistance claim. Instead, it responded to the original § 2254 petition, limiting its analysis of Webb's and Thomas's testimony to the observation that federal habeas corpus law has not recognized freestanding claims of actual innocence.

The district court denied relief, concluding that the state court had not unreasonably applied the principles of *Strickland v. Washington*, 466 U.S. 668 (1984). *United States ex rel. Blackmon v. Hardy*, No. 11 C 2358, 2014 WL 3511497, at *2–3 (N.D. Ill. July 16, 2014). The district court also upheld the state court's rejection of the actual innocence claim, finding the analysis of the Thomas and Webb affidavits was reasonable. *Id.* at *4. We granted a certificate of appealability as to whether Blackmon's trial counsel "was ineffective for failing to call an occurrence witness and numerous alibi witnesses." We also instructed the parties to address whether Blackmon had defaulted any of his ineffective-assistance theories; whether he had demonstrated actual innocence excusing default; and

---

[1] The purported *Brady* violation was based on the failure of the police to provide Blackmon with Webb's contact information; Blackmon has not pursued that claim in this appeal.

whether 28 U.S.C. § 2254(d) applies to state court findings regarding actual innocence.

II. *Analysis*

We review *de novo* the district court's decision denying habeas relief. *Stitts v. Wilson*, 713 F.3d 887, 891 (7th Cir. 2013). Blackmon is in state custody, so we review his claims under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under § 2254(d), federal courts may not grant relief on any claim adjudicated on the merits by a state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Blackmon relies on the "unreasonable application" prong of § 2254(d)(1). Under this provision, a federal court may grant habeas relief if the state court correctly identified the governing legal principle from the Supreme Court's case law but unreasonably applied it to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (citations omitted). This is a high standard: to grant relief, the state court's decision must be objectively unreasonable, not merely incorrect. *Id.* at 520–21 (citations omitted); *Badelle v. Correll*, 452 F.3d 648, 654–55 (7th Cir. 2006). The Supreme Court has warned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); see, e.g., *White v. Wheeler*, 136 S. Ct. 456

(2015) (per curiam) (summarily reversing grant of habeas corpus relief for failure to extend sufficient AEDPA deference to state court's determination).

This appeal also presents questions of procedural default, which we review *de novo*. *Richardson v. Lemke*, 745 F.3d 258, 269 (7th Cir. 2014). A state prisoner must give the state an opportunity to correct alleged violations of federal rights by fairly presenting his claim through a full round of state court review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999). The failure to do so results in procedural default. *Id.* at 848. Federal courts will not review a procedurally defaulted claim unless the petitioner can demonstrate cause for and prejudice stemming from that default, or, alternatively, that the denial of relief will result in a miscarriage of justice. *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) (citations omitted). The miscarriage of justice exception "applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013). To meet that standard, he must demonstrate, based on new, reliable evidence, that "' in light of new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. '" *Coleman v. Hardy*, 628 F.3d 314, 319 (7th Cir. 2010), quoting *House v. Bell*, 547 U.S. 518, 537 (2006).

Procedural default is not jurisdictional. *Trest v. Cain*, 522 U.S. 87, 89 (1997); see *Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005). Rather, it is "an affirmative defense that the State is obligated to raise and preserve, and consequently one that it can waive." *Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004)

"As with any other right or defense, the State will waive procedural default by intentionally relinquishing its right to assert that defense," either explicitly or implicitly. *Id.*

A. *Procedural Default of Claims Based on Webb's and Thomas's Testimony*

Blackmon argues that his trial counsel's failure to locate and investigate Webb and Thomas, who worked in the barber shop, was one of several errors amounting to ineffective assistance. The State responds that Blackmon procedurally defaulted this claim by failing to raise it through one complete round of state court review. Blackmon contends in turn that the State implicitly waived its right to assert procedural default by failing to raise it in the response to his § 2254 petition filed in the district court.

Working our way backwards through these contentions, we first reject the argument that the State implicitly waived or forfeited the procedural default defense. Blackmon did not raise the failure to discover Webb and Thomas as a basis for his ineffective-assistance claim in the district court until he filed his supplemental memorandum, and the district court never ordered the State to respond to it. Under these unusual procedural circumstances, the State did not show "the intent to relinquish the defense that is the essence of true waiver." *Perruquet*, 390 F.3d at 517 (finding no waiver where state had at most remained silent on procedural default issue). Nor would it be fair to hold the State to forfeiture where Blackmon introduced the claim so late.

Next, Blackmon procedurally defaulted this basis for his ineffective-assistance claim. To preserve a claim for federal

habeas review, a state prisoner must fairly present the opera-tive facts and legal principles controlling the claim through a full round of state court review. *Mulero v. Thompson*, 668 F.3d 529, 536 (7th Cir. 2012), quoting *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). This rule requires that the factual and legal substance of the claim remain essentially the same when the petitioner has exhausted his state court remedies and moved on to federal court. *Anderson v. Benik*, 471 F.3d 811, 814–15 (7th Cir. 2006). With ineffective-assistance claims, we have held that a petitioner procedurally defaults individual claimed de-ficiencies when he does not fairly present them to the state courts, even if he presented an ineffective-assistance claim based on other alleged errors. See *Mulero*, 668 F.3d at 536.

Blackmon presented an ineffective-assistance claim through one full round of state-court review, but it was based on the other matters we discuss below. His second post-con-viction petition included a claim based on the Webb and Thomas affidavits, but he framed that as a freestanding ac-tual-innocence claim, not an ineffective-assistance claim. Thus, neither the legal nor the factual substance of the claim he now seeks to assert was before the state courts, meaning he has procedurally defaulted that claim.

We might nevertheless address the merits of Blackmon's claim if he could show cause and prejudice or a miscarriage of justice—that is, "the conviction of an innocent person." *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005). He relies on the latter, arguing that the affidavits of Webb and Thomas constitute "new reliable evidence," *Schlup v. Delo*, 513 U.S. 298, 324 (1995), and that in light of that new evidence, it is

"more likely than not that no reasonable juror would have convicted him," *id.* at 327.[2]

As noted above, *Schlup* requires Blackmon to show that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt— or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006). The *Schlup* standard "is demanding and permits review only in the 'extraordinary' case." *Id.*, quoting *Schlup*, 513 U.S. at 327; see also *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1936 (2013) ("We stress once again that the *Schlup* standard is demanding."); *Gladney v. Pollard*, 799 F.3d 889, 896 (7th Cir. 2015) ("The actual innocence gateway is narrow."). Our function "is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538, citing *Schlup*, 513 U.S. at 329. In applying this standard, we must consider all the evidence, both old and

[2] In assessing whether Blackmon satisfied the *Schlup* standard, the district court appears to have extended § 2254(d) deference to the state court's resolution of Blackmon's actual-innocence claim. We asked the parties to address whether 28 U.S.C. § 2254(d) applies to state court findings regarding a claim of actual innocence. They agree that under these circumstances it does not. In fact, the State relies on *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010), which states that § 2254(d) "has no application in the context of a *Schlup* claim because it pertains only to a 'claim that was adjudicated' in state court." State courts simply have no occasion to adjudicate *Schlup* claims as such because those claims address only federal procedural obstacles to relief. In light of the parties' agreement, we assume for the present appeal that no § 2254(d) deference is due to the state court's resolution of Blackmon's actual innocence claim and review *de novo* the district court's decision as to whether no reasonable juror would convict given all the evidence. *Coleman v. Lemke*, 739 F.3d 342, 349 (7th Cir. 2014).

new, incriminating and exculpatory, without regard to whether it would necessarily be admitted at trial. *Id.*, citing *Schlup*, 513 U.S. at 327–28. We then make a "probabilistic determination about what reasonable, properly instructed jurors would do." *Id.*, quoting *Schlup*, 513 U.S. at 329.

The new evidence from Webb and Thomas does not meet this demanding standard for actual innocence. We recognize that the State's case against Blackmon had important weaknesses: no physical evidence tied him to the murder, and the State introduced no evidence of a motive. But to counter, the State had matching independent identifications from Reece and McDowell. We have repeatedly recognized high rates of error in eyewitness identifications of strangers. *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009); *Raygoza v. Hulick*, 474 F.3d 958, 965 (7th Cir. 2007); *Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir. 2003). But we have also recognized that those findings "have only limited application when multiple witnesses identify the same person." *Bartlett*, 567 F.3d at 907; see also *Morales v. Johnson*, 659 F.3d 588, 601 (7th Cir. 2011) ("Each witness's identification of Morales as the shooter corroborated the other's testimony."); *United States v. Williams*, 522 F.3d 809, 812 (7th Cir. 2008) ("[T]he number of identifications supplies valuable information. Even if the risk that any one identification would be mistaken is substantial, the risk that multiple witnesses would make the same error is smaller.").[3] Further-

---

[3] Certainly, there are situations in which multiple identifications are of limited value—if the eyewitnesses have contact with one another, for example, or if they make those identifications due to similarly suggestive police procedures. See Brandon Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* 50–51 (2011) (noting that 36% of exonerees whose cases involved eyewitness identification were wrongly identified

more, some of the State's criticisms of Blackmon's defense evidence are well founded. Arrigo had shown himself unreliable (and possibly even involved in the murder). And the alibi witnesses' testimony is fairly subject to the criticism that it was acquired years after the barbecue in question and purports to recount fairly specific details of an unremarkable gathering. See *Woods v. Schwartz*, 589 F.3d 368, 377 (7th Cir. 2009) (rejecting claim of actual innocence based on alibi affidavits of family members that were prepared years after the murder and noted "with incredible particularity the most pedestrian details of that night," even though "the night was like any other").

Webb and Thomas saw the shooters for no longer than Reece and McDowell (in fact, Webb did not even see them until they were already fleeing). Furthermore, they did not come forward until eight years after the murder, a substantial delay that could affect their memories and/or their credibility. See *Schlup*, 513 U.S. at 332 (holding that "the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence").

---

by multiple eyewitnesses); Deborah Davis & Elizabeth F. Loftus, *The Dangers of Eyewitnesses for the Innocent: Learning from the Past and Projecting into the Age of Social Media*, 46 New Eng. L. Rev. 769, 807 (2012) (noting that "converging identifications seem particularly persuasive if one does not recognize that: (1) witnesses can influence one another, and (2) separate witnesses can each be affected by the same suggestive influences (such as suggestive police procedures)"). Blackmon has not attacked the police procedures, however, and nothing in the record suggests McDowell and Reece had any contact with one another before or while making their identifications.

This sort of balance between inculpatory and exculpatory witnesses is not enough to meet the demanding *Schlup* standard for actual innocence. See, e.g., *Smith v. McKee*, 598 F.3d 374, 388 (7th Cir. 2010) (two exculpatory eyewitnesses insufficient to counter state's two inculpatory eyewitnesses); *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("Suppose that the six alibi witnesses had been called. That would at best have produced a draw: six eyewitnesses identify Hayes as the culprit, six others exculpate him. That cannot establish that 'no reasonable factfinder would have found the applicant guilty of the underlying offense[.]'"); see also *id.* ("[p]roof of innocence must be considerably more than the proof required to establish prejudice" needed for ineffective assistance of counsel). Blackmon has not shown the miscarriage of justice needed to excuse his procedural default, so we do not consider the merits of the claim based on the testimony of Thomas and Webb.

B.  *Merits of the Remaining Ineffective-Assistance Claims*

Blackmon asserts two non-defaulted bases for his claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984): the failure to call Arrigo as a witness at trial, and the failure to investigate and present additional alibi testimony. The operative question is whether the state court reasonably applied the familiar two-pronged test of *Strickland*: (1) whether counsel's performance "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and (2) whether counsel's errors prejudiced the defendant, requiring him to show a reasonable probability that, but for those errors, the result of the proceeding would have been different, *id.* at 694; see also *Allen v. Chandler*, 555 F.3d 596, 600

(7th Cir. 2009). The state court found that counsel's perfor-
mance was not constitutionally deficient, so we must give
AEDPA deference to that conclusion, upholding it so long as
it is not objectively unreasonable. *Badelle v. Correll*, 452 F.3d
648, 654–55 (7th Cir. 2006).

### 1. *Richard Arrigo*

We cannot disagree with the state court's finding that the
decision not to call Arrigo was a reasonable strategic decision.
"The Constitution does not oblige counsel to present each and
every witness that is suggested to him." *United States v. Berg*,
714 F.3d 490, 499 (7th Cir. 2013), quoting *United States v. Best*,
426 F.3d 937, 945 (7th Cir. 2005). Rather, counsel need only in-
vestigate possible lines of defense and make an informed de-
cision. *Id.* "If counsel has investigated witnesses and con-
sciously decided not to call them, the decision is probably
strategic." *Best*, 426 F.3d at 945. Strategic decisions like these,
so long as they are made after a thorough investigation of law
and facts, are "virtually unchallengeable." *Strickland*, 466 U.S.
at 690.

Arrigo looks helpful at first glance. We must assume he
would have supported Blackmon's version of events by testi-
fying that he saw the shooting and that Blackmon was not
there. But Blackmon glosses over serious potential problems
with that testimony. Arrigo had been caught lying to the po-
lice during the course of the investigation. He claimed that he
did not have Cox's phone number but later admitted that a
voicemail on Cox's cell phone featured his voice. His cell
phone records showed he called Cox before the murder, and
George Davis after it. Blackmon's attorney could reasonably
have concluded that putting Arrigo on the stand would do
more harm than good. For example, a trier of fact might have

believed that Arrigo helped arrange the murder and sought to protect his co-conspirator. Arrigo's testimony would also have undermined the defense testimony from Boyd, who claimed that Arrigo's friend George Davis was present at the shooting. Arrigo consistently maintained that he did not recognize either shooter. Also, Boyd did not even remember seeing Arrigo at the scene. Blackmon's attorney could reasonably have taken this into account as well.

Blackmon argues that he can "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). He contends that the failure to call Arrigo was not strategic but was caused by counsel's accidental failure to secure his attendance at trial. See *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) (presumption that strategic judgments are reasonable "applies only if the lawyer actually exercised judgment"). Blackmon relies on this exchange between counsel and the trial judge:

> THE COURT: You've got two more witnesses?
>
> [COUNSEL]: I have one for certain and I had spoken with another gentleman that was suppose[d] to be here but he's a little—I don't want to—
>
> THE COURT: Okay.
>
> [COUNSEL]: —characterize him in any fashion.

Blackmon argues that the most reasonable inference is that counsel was referring to Arrigo, who failed to show up. That

is one possible inference, but not the only one. Nothing in this exchange shows that the "gentleman" in question was Arrigo or that counsel failed to secure his attendance through inattention. The state court did not act unreasonably by finding that the decision not to call Arrigo was reasonable as a matter of strategy. In addition, given all the baggage Arrigo would have carried as a witness, we could not say that the failure to call him prejudiced Blackmon. That failure would not undermine confidence in the verdict.

### 2. *Alibi Witnesses from the Barbecue*

The alibi witnesses present a very different problem. As noted above, the decision not to call a particular witness is frequently strategic, insulated from attack on ineffective-assistance grounds. "An outright failure to investigate witnesses, however, is more likely to be a sign of deficient performance." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005), citing *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); see also *Strickland*, 466 U.S. at 690–91 ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

On this record, the State must concede, at least for purposes of this appeal, that counsel did not interview any of the additional alibi witnesses whom Blackmon identified, but the State argues it was enough that counsel "learned the substance" of their testimony from interviews with Blackmon and his family members. Blackmon's affidavit, which the State cites for support, says only that Blackmon informed his counsel he was at the barbecue, that plenty of people could vouch for his presence, and that he eventually provided his counsel

with names, addresses, telephone numbers, and as much information as he could on potential alibi witnesses. This does not mean that counsel knew the substance of those witnesses' testimony. Counsel had no way of knowing, for example, if any of the witnesses could definitively place Blackmon at the barbecue at 4:30 p.m. Such testimony could have provided Blackmon with a much stronger alibi. Nor does it appear that counsel or the state court considered the benefits of alibi testimony from disinterested witnesses who, as far as we know (and unlike Wash and Leavy, who did testify for Blackmon), had no family ties to Blackmon and no felony convictions. See *Raygoza*, 474 F.3d at 963 (noting that "witnesses both related and unrelated to Raygoza could have been called"); *Washington v. Smith*, 219 F.3d 620, 634 (7th Cir. 2000) (testimony of additional alibi witnesses without criminal records "would have added a great deal of substance and credibility" to alibi).

Counsel's failure to investigate undermines the state court's analysis, which appears to assume that counsel knew, somehow, that the additional alibi witnesses would offer purely cumulative testimony. If counsel never learned what the witnesses would have said, he "could not possibly have made a reasonable professional judgment that their testimony would have been cumulative." *Mosley*, 689 F.3d at 848; see also *Campbell v. Reardon*, 780 F.3d 752, 764 (7th Cir. 2015) (rejecting state court's assumption that lawyer's decision not to interview eyewitnesses was reasonable; proper inquiry was "whether the investigation supporting counsel's decision" not to call the witnesses "was itself reasonable"). The unreasonableness of counsel's failure to investigate is further bolstered by the significant potential benefits of obtaining alibi testimony from witnesses unimpaired by family ties to Blackmon

or prior convictions, another point the state court apparently did not consider.

The State also argues that the individual alibi witnesses would themselves have had vulnerabilities. That's possible, of course, but counsel could not have known those vulnerabilities without doing at least some investigation of the witnesses and the testimony they could provide. There is also no indication he considered the effect all the witnesses might have had in combination, any individual weaknesses notwithstanding. See *Raygoza*, 474 F.3d at 964 (rejecting attorney's decision not to call additional alibi witnesses where he "picked off" each witness based on potential vulnerabilities without considering the cumulative impact of their testimony).

*Strickland* "permits counsel to 'make a reasonable decision that makes particular investigations unnecessary.'" *Harrington*, 562 U.S. at 106, quoting *Strickland*, 466 U.S. at 691. But the record provides no support to treat as reasonable a decision not to investigate further the available alibi witnesses from the barbecue. Blackmon's location at 4:30 p.m. was the pivotal issue for the defense. Additional disinterested and credible alibi witnesses could have made a significant difference in the viability of Blackmon's defense, especially given the problems with the alibi witnesses who did testify. See *Washington*, 219 F.3d at 631 (attorney's failure to try to contact any witnesses besides one was ineffective, and state court's decision to the contrary was an unreasonable application "of *Strickland*'s requirement that an attorney conduct a reasonable investigation in connection with his client's case"). Nothing in the record shows that investigating those witnesses would have been "fruitless or harmful," *Campbell*, 780 F.3d at 765, citing *Strick-

*land*, 466 U.S. at 691, and the benefits could have been enormous. Just one witness might have been able to give Blackmon a true alibi. At a minimum, all of them could have bolstered his claim of being at the barbecue all afternoon. It is not reasonable strategy to leave such possible testimony unexplored under these circumstances. So even giving both counsel and the state court the substantial deference they are due under *Strickland* and AEDPA, respectively, the state court's finding with respect to trial counsel's performance was, on this record, unreasonable.

Finally, we must determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The state court never reached the prejudice question, so we review *de novo* that prong of *Strickland*. See *Sussman v. Jenkins*, 636 F.3d 329, 350 (7th Cir. 2011), quoting *Toliver v. McCaughtry*, 539 F.3d 766, 775 (7th Cir. 2008). "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.'" *Mosley*, 689 F.3d at 851, quoting *Strickland*, 466 U.S. at 694. Unlike the more demanding *Schlup* inquiry, the issue here is not whether Blackmon is actually innocent, but instead whether he would have had a "reasonable chance" of acquittal absent counsel's errors. *Stanley v. Bartley*, 465 F.3d 810, 814 (7th Cir. 2006) (noting also that "it needn't be a 50 percent or greater chance"). In undertaking this inquiry, we must "consider the totality of the evidence before the judge or jury. A verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001), citing *Strickland*, 466 U.S. at 696; see, e.g., *Thomas v. Clements*, 789 F.3d 760, 771–72 (7th Cir. 2015).

We begin there, with the weakness of the State's case. No physical evidence tied Blackmon to the crime, nor did the State present any evidence of motive or connection between Blackmon and the victim. The only evidence connecting Blackmon to the murder was the eyewitness testimony of McDowell and Reece. That was enough to support the guilty verdict but is by no means ironclad. Neither witness saw the second shooter's face for long, and both were strangers to Blackmon, increasing the danger of mistake. See *United States v. Brown*, 471 F.3d 802, 804 (7th Cir. 2006) ("Even under the best circumstances, the probability of erroneous identification of a stranger seen briefly is uncomfortably high."), citing Elizabeth F. Loftus, *Eyewitness Testimony* (1979), and Daniel L. Schacter, *The Seven Sins of Memory* 88–137 (2001). As noted above, the two corroborating identifications help make mistakes less likely, but mistakes are certainly still possible where two eyewitnesses identify the same alleged perpetrator. Garrett, *supra*, at 50–51. And their confidence in their identifications (a point that impressed the trial judge in their favor) is not a reliable indicator of accuracy. See *Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir. 2003) ("Psychological research has established that the witness's faith is equally strong whether or not the identification is correct."); Garrett, *supra*, at 63 (noting that almost all the eyewitnesses who testified at exonerees' trials "expressed complete confidence at trial that they had identified the attacker"); see also *Williams*, 522 F.3d at 812 (discussing how witnesses' memories realign over time to match earlier statements, so "trial testimony may reflect more confidence than is warranted").

Against this weak case for Blackmon's guilt we balance the defense bolstered by several additional alibi witnesses, most

of whom are, as far as we know now, disinterested and unencumbered by prior convictions. See *Washington*, 219 F.3d at 634 ("Rather than one direct alibi witness with a criminal record, Washington could have had three potentially more credible witnesses[.]"). Six of the seven new witnesses recall being at the barbecue at 4:30 p.m., when the murder occurred. Some of them specifically recall interacting with Blackmon at the picnic; all say they never saw Blackmon leave or noticed he was gone. At a casual gathering with people coming and going, it is perhaps unlikely that a single person could vouch for Blackmon's continued presence there. But adding another witness who can say the same thing makes it less likely that Blackmon would have been able to slip away unseen long enough to commit the murder. Adding six such witnesses makes it less likely still, particularly when some of those witnesses can testify to actual interactions with Blackmon during the course of the afternoon, like Lashun Melton, who says she played cards with him sometime between about 4:00 and 6:00 p.m., or Tiara Topps, who says she flirted with him sometime between about 3:00 and 6:00 p.m. In a large-group setting like this one, the collective weight of the other guests' testimony is greater than the sum of their individual accounts.

The alibi witnesses' testimony is not definitive, of course. Maybe they are honestly mistaken or even lying. It's also possible that everyone who would testify that Blackmon was at the barbecue all afternoon missed seeing him leave during the critical window of time. No one can testify specifically to seeing him close to the critical time of 4:30 p.m., though Sheryce Crowder, the mother of Blackmon's daughter, claimed she was near him all afternoon. All of the witnesses are vulnerable to attacks on their memory at this point. Many of them did not know until years after the barbecue that Blackmon had

been arrested for murder. At the time, they would have had no reason to consider the barbecue or Blackmon's presence at it of any particular importance.

These are fair criticisms. But to establish prejudice, Blackmon does not have to prove actual innocence; he does not even have to show that counsel's errors more likely than not altered the outcome in his case. *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011), quoting *Strickland*, 466 U.S. at 693, 697; *Campbell*, 780 F.3d at 769; *Raygoza*, 474 F.3d at 963. He must show only a reasonable likelihood that the outcome would have been different—that is, a likelihood that is "substantial, not just conceivable." *Richter*, 562 U.S. at 112, citing *Strickland*, 466 U.S. at 693. Given the weakness of the State's case—the complete lack of any motive, the dearth of physical evidence, and the heavy reliance on the eyewitness identifications of two strangers who saw the killers for only seconds—we conclude that on this record, it is "substantially likely that [Blackmon] could have raised at least a reasonable doubt and had a different outcome at trial" if counsel had provided adequate representation. *Thomas*, 789 F.3d at 772.

With our § 2254(d)(1) analysis limited to the record that was before the state court, we conclude that the state court's decision was unreasonable. See *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Mosley*, 689 F.3d at 841. We have recognized, however, that although the conclusion that a state court's summary decision made on the basis of affidavits was an unreasonable application of federal law will often show the petitioner is entitled to relief, "it will not do so always and automatically." *Mosley*, 689 F.3d at 853. As in *Campbell* and *Mosley*, the state court here summarily dismissed Blackmon's petition for post-conviction relief. It never tested the truth of the alibi

witnesses' affidavits through any form of adversarial process. "Having concluded that the affidavits and statements, if true, are sufficient to warrant habeas relief, we still have no factual findings on these questions to review, and the record"— which contains no affidavit from defense counsel, for example—"is otherwise ambiguous." *Campbell*, 780 F.3d at 772. Under these circumstances, "an evidentiary hearing is needed to develop the record on (1) the extent of counsel's actual pretrial investigation and (2) what these witnesses would have said if called to testify at trial." *Id.* Whether Blackmon is entitled to habeas corpus relief will depend on the outcome of that hearing and the district court's factual findings. See *id.* at 772–73.[4]

We VACATE the denial of Blackmon's petition for a writ of habeas corpus, and REMAND this matter to the district court for consideration of whether Blackmon is actually in custody in violation of the United States Constitution.

---

[4] We see no reason why Blackmon would not be able to call the salon witnesses, Latonya Thomas and Lajuan Webb, as witnesses in the evidentiary hearing on remand. We have explained why an independent claim of ineffective assistance based on their testimony has been procedurally defaulted (i.e., forfeited). Nevertheless, their testimony might well corroborate the testimony of the alibi witnesses from the barbecue and thus be relevant to the factual findings the district court will need to make at least on the prejudice prong of the *Strickland* analysis.

POSNER, *Circuit Judge*, concurring and dissenting. I agree
with the decision to remand this case, but not with the ma-
jority's treatment of two critical potential witnesses for the
petitioner, witnesses whom his lawyer failed to interview
(or, so far as appears, failed even to attempt to interview),
and by failing rendered ineffective assistance (I would prefer
to say, provided inadequate professional assistance) to his
client.

For a litigant to avoid being bound, as a litigant ordinari-
ly is, by his lawyer's mistakes, a petitioner for federal habeas
corpus must establish "a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding
would have been different. A reasonable probability is a
probability sufficient to undermine confidence in the out-
come." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The
majority opinion in the present case finds that the petitioner
has presented compelling evidence that he probably would
not have been convicted of murder had it not been for his
trial counsel's indefensible failure to interrogate potential
alibi witnesses, and that therefore the case should be re-
manded to allow him to put those (and perhaps other) wit-
nesses on the stand.

But I don't agree with the majority's decision to exclude
from the remand a parallel inquiry into trial counsel's failure
to interview employees of a hair salon that adjoined the res-
taurant in front of which the murder took place. They were
potential trial witnesses who have signed affidavits that if
accurate provide powerful evidence of the petitioner's inno-
cence. The majority rejects this claim of inadequate profes-
sional assistance because Blackmon failed to raise it in the
state court (in contrast, he had raised, in state post-

conviction proceedings, the failure of trial counsel to inter-
view the alibi witnesses). But such a forfeiture is excusable if
"it is more likely than not that no reasonable juror would
have found petitioner guilty beyond a reasonable doubt"
had the jury been given the evidence that the defendant's
lawyer failed through negligence to uncover. *Schlup v. Delo*,
513 U.S. 298, 327 (1995), so holds, and in *House v. Bell*, 547
U.S. 518, 538 (2006), we read that although "the *Schlup*
standard is demanding and permits [federal court] review
only in the 'extraordinary' case … [it] does not require abso-
lute certainty about the petitioner's guilt or innocence. …
[His] burden at the gateway stage is to demonstrate that
more likely than not, in light of the new evidence, no rea-
sonable juror would find him guilty beyond a reasonable
doubt."

The hair-salon employees' evidence might not be enough
to carry the day for Blackmon given this demanding stand-
ard; nor the alibi witnesses' evidence; but together the two
bodies of evidence constitute (in combination with other fac-
tors that I'll discuss) a powerful showing that Blackmon is
innocent. The majority is willing to allow both sets of wit-
nesses—the alibi witnesses and the hair-salon witnesses—to
testify on remand, but the hair-salon witnesses only condi-
tionally: they may testify only to the extent that their testi-
mony is relevant to the claim that Blackmon's lawyer ren-
dered ineffective assistance by failing to interview the *alibi*
witnesses. The majority concludes that Blackmon's other in-
effective-assistance claim—the claim based on trial counsel's
failure to interview the hair-salon witnesses—must be dis-
missed because the evidence given by the hair-salon wit-
nesses does not establish a sufficient probability of inno-

cence to excuse Blackmon's forfeiture of that claim. I disagree, for reasons that I'll explain.

Not until eight years after the murder did Blackmon obtain affidavits of the two employees of the hair salon, Latonya Thomas and Lajuan Webb, each of whom has submitted an affidavit that attests that the affiant was a witness to events surrounding the murder and that Blackmon was not one of the murderers. Though Webb did not see the shootings, immediately after hearing shots he saw two men he recognized run past the window of the salon holding guns. Neither man was Blackmon. Thomas, according to her affidavit, did see the shooting—and said she was *sure* that neither shooter was Blackmon.

Each of the affiants knew the shooters from the neighborhood, and "social-science studies do not suggest that people who have known one another for weeks or years are apt to err when identifying them in court." *United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009). Thomas's affidavit states that after hearing what she thought were fireworks she looked through the "large plate glass window in the front of the salon," saw the first man shoot the victim and the victim "fall to the ground in front of the business just south of the salon," and then saw the second shooter approach the prone victim and shoot him "several more times." She recognized this second shooter as "a man nicknamed 'Pee' (Real Name Unknown) who was in his late twenties." She was "sure of the identity of the two men … because I've seen them both hanging out on the street around the salon countless times." Shown photographs of Blackmon, she said he wasn't one of the shooters. Her statement that the second shooter was named "Pee" is consistent

with early investigative leads and with Terrance Boyd's testimony, which I discuss further below, that a man named "Pride" (Eric Bridges) was the second shooter. "Pee" (that is, the letter "P" as it is pronounced when standing alone) could well be short for "Pride."

Lajuan Webb's affidavit is similar. He said he heard gun shots and then saw "two guys with guns ran past the barber shop." He'd "seen those two guys that had the guns prior to the day of the shooting in the neighborhood near the barber shop" and Blackmon "was not one of the guys I seen running past the barber shop holding a gun." He said the police had questioned him immediately after the shooting but had never followed up.

The hair-salon witnesses are more reliable than the state's two witnesses, who in a photo array, then in a line-up, and finally at trial, had identified Blackmon as the second shooter. Those witnesses had never met or seen the second shooter before the murder, while the hair-salon witnesses had seen both shooters before then, knew them, and were sure that neither was Blackmon. As for those witnesses' failure to come forward with their testimony for years, Thomas explained that she "was fearful that those guys [the shooters] might have found out and tried to do something to me" had she spoken to police. Had she thought that Blackmon was one of the shooters and had been arrested, she would not have been fearful that the shooters (plural) would have tried to do something to her; she would have known that one of them had been caught and neutralized. (Webb said he hadn't known that anyone had been arrested for the crime.)

The affidavits of the salon witnesses bolster the affidavits of the alibi witnesses on whom the majority opinion bases its

decision to remand the case. The alibi witnesses claim to have seen Blackmon at a barbecue around the time of the murder and did not see him leave during that time. And all but two of them neither had nor have any close connection to him and thus would have no reason to lie to protect him. But the hair-salon witnesses likewise had and have, so far as appears, no ties to Blackmon that might cause them to lie on his behalf. (It's not known whether either of them had any criminal history that might undermine their affidavits.)

The two eyewitnesses to the murder on whom the government rests its case had previously identified Blackmon in a photo array and then in a line-up as the second shooter. Neither recognized the second shooter as someone they'd ever met. The photo arrays postdated the murder by nearly two months and were confusing, as they contained only black-and-white photos, thus concealing hair color, skin tone, and other facial features. One of the eyewitnesses testified that she'd seen the second shooter's face for "maybe three" seconds, the other for five seconds "maybe." Both had been distracted. They had been in their cars at the time, both with children—five between the two of them. One, a twelve-year-old, viewed the same photo array as the two grown-ups but identified someone other than Blackmon as one of the shooters, and did not identify Blackmon as the other. Although one of the mothers had called 911 as she drove away from the murder scene, she testified that the police had not contacted her until more than a month after the shooting. One of the mothers testified that she'd told officers she'd seen an Italian or Hispanic man (Richard Arrigo, discussed in the majority opinion) holding a gun in his hand, the other that that man wasn't holding a gun and that two black men were the shooters.

No physical evidence tied Blackmon to the murder, and the state presented no evidence of a motive—and couldn't even explain why he'd been included in the photo array in the first place. Though one detective said the police had received information about Blackmon's involvement in the murder "from family members," the family members were never identified and it isn't even clear to whose family the detective was referring. The prosecution presented no evidence that Blackmon had known either the murder victim or the man who was identified by the 12-year-old as one of the assailants and is believed on the basis of additional evidence to have been the first shooter. Although the police had heard that the shooting was the result of a dispute among gang members, no evidence of that was presented at the trial—or that Blackmon was a gang member.

Earlier I noted evidence pointing to Eric Bridges ("Pride") as the second shooter. He belonged to the same gang as the murder victim. Neither of the state's eyewitnesses was shown a photo of Bridges even though the police had learned four days after the murder that one of the shooters was called "Pride," and Terrance Boyd told them before Blackmon's trial that Bridges was the second shooter. Boyd testified that he'd met up with Tony Cox (the murder victim) on the day of the shooting because Cox had said he needed to discuss business with Bridges. Boyd said he left the two of them so that they could talk privately and walked into a nearby alley and while there he heard gunshots and "saw Eric Bridges shooting—shooting Tony" about twenty feet from where Boyd was standing. That the police didn't show the state's two eyewitnesses a photograph of Bridges was a remarkable investigative failure.

The case is much like *Schlup*. Schlup had been convicted of murdering another prison inmate. The state's evidence consisted of testimony by two corrections officers who had witnessed the killing. Schlup's defense included a video showing him in the prison dining room, far from where the murder took place, 65 seconds before the alarm was sounded. After the trial Schlup presented evidence that another guard had seen him elsewhere in the prison right around the time of the murder, plus statements of numerous eyewitnesses to the murder who swore that Schlup had not committed it. The Supreme Court said that if the new statements were found to be reliable, "it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict." *Schlup v. Delo, supra*, 513 U.S. at 331.

And in *Larsen v. Soto*, 742 F.3d 1083, 1098–99 (9th Cir. 2013), we read that "despite the Warden's repeated arguments that a 'swearing match' between prosecution and defense witnesses is insufficient to satisfy *Schlup*, [he] never meaningfully explains how a jury faced with evidence from five different witnesses that a different person threw the knife could nonetheless have concluded that Larsen was guilty beyond a reasonable doubt. If the fact that prosecution witnesses testified against the defendant at trial were sufficient to defeat any actual innocence claim, the *Schlup* doctrine would be meaningless. Indeed, *Schlup* itself is to the contrary."

I agree with the statement in the majority opinion "that Blackmon's trial counsel was constitutionally ineffective by failing to investigate the alibi witnesses and [that this] shows that the state court's summary dismissal of the claim was

unreasonable." And I agree that a "state court's mistake in summarily rejecting a [habeas corpus] petition, *i.e.*, without fully evaluating conflicting evidence on disputed factual issues, does not *necessarily* mean the petitioner is ultimately entitled to relief." *Mosley v. Atchison*, 689 F.3d 838, 842 (7th Cir. 2012) (emphasis added). So a hearing is necessary. But Blackmon's fate should not depend entirely on the alibi witnesses. The evidence of the hair-salon witnesses is sufficiently reliable to justify a hearing about whether no reasonable juror would have convicted him had they heard those witnesses' testimony, and such a ruling would forgive his having forfeited his claim of ineffective assistance by reason of his lawyer's failure to interview the hair-salon witnesses before the murder trial. See *Schlup v. Delo*, *supra*, 513 U.S. at 331–32; *Coleman v. Hardy*, 628 F.3d 314, 318–23 (7th Cir. 2010); *Wolfe v. Clarke*, 691 F.3d 410, 420–22 (4th Cir. 2012).

Ineffective assistance of counsel in regard to the potential hair-salon witnesses, forfeited because not urged by counsel in the state court proceedings, is a constitutional error that can support a petition for habeas corpus. The failure of Blackmon's trial counsel to locate and interview the two employees of the salon who had seen the murderers, recognized them, and were sure that Blackmon was not one of them, was a disastrous blunder given the paucity of evidence of his guilt. Counsel must have accepted the police reports (which stated that one person at the salon had been interviewed and had not seen the murder) uncritically; for he failed to conduct his own investigation to discover whether anyone else had been in the salon. Although Blackmon's new evidence should be subject to scrutiny on remand, he has made a strong showing that his lawyer's failure to find and interview the hair-salon witnesses fell be-

low the minimum standard of reasonable representation of a defendant charged with murder and greatly harmed Blackmon's defense. Cf. *Campbell v. Reardon*, 780 F.3d 752, 767–72 (7th Cir. 2015); *Mosley v. Atchison*, *supra*, 689 F.3d at 848–49; *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 249–56 (7th Cir. 2003); *Washington v. Smith*, 219 F.3d 620, 629–32 (7th Cir. 2000).

The *Schlup* standard "does not require absolute certainty about the petitioner's guilt or innocence." *House v. Bell*, *supra*, 547 U.S. at 538. Yet the evidence emanating from the hair-salon witnesses comes close. They knew the shooters and say with certainty that neither one was Blackmon—instead the second one probably was Eric "Pride" Bridges. The two hair-salon witnesses have no known connection—family, business, social, political—to Blackmon and thus nothing to gain from lying to protect him. Compare *Smith v. McKee*, 598 F.3d 374, 388 (7th Cir. 2010); *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005).

The hair-salon witnesses' affidavits, in combination with the other evidence of Blackmon's evidence that I've just summarized, would seem to outweigh the identification of him as one of the shooters, months after the shootings, by two unreliable eyewitnesses. Against this the majority opinion argues that "even if the risk that any one identification would be mistaken is substantial, the risk that multiple witnesses would make the same error is smaller." Were this true (as I doubt, because a witness may be influenced by a forceful, confident, yet thoroughly erroneous report by another witness of the same event), it still would do nothing to bolster the majority's belief that the government's eyewitnesses were more reliable than the hair-salon witnesses. For

there were two of them also—making them multiple witnesses, too, and the multiple was identical to that of the government's witnesses. The majority opinion thus does nothing to enable us to distinguish the accuracy of the government's eyewitnesses from that of the hair-salon witnesses—yet for reasons explained earlier in this opinion the latter witnesses seem more credible than the former.

The majority opinion points out that the hair-salon witnesses did "not come forward until eight years after the murder, a substantial delay that could affect their memories and/or their credibility." Could; but I imagine that witnessing a murder is the kind of experience that sticks with one for many years, especially when one recognizes the murderers.

In sum, the hair-salon witnesses' evidence by itself, without regard to the alibi witnesses' evidence, if found reliable would entitle Blackmon to a new trial. And a remand to determine that reliability is essential, lest the alibi witnesses prove to be unconvincing on remand.

On this note I end my discussion of Blackmon's appeal with a plea to the majority to reconsider its brush off of the hair-salon witnesses. But I want in closing to mention some reservations that I have concerning terminology in the majority opinion. I do not criticize the majority for the terminology. It is taken from previous decisions, many of them Supreme Court decisions; it is not the invention of this panel. But legal language is a plague, much of which originates in Supreme Court opinions.

An example of what troubles me is the majority opinion's numerous iterations of the phrase "actual innocence," and its

occasional invocations of the cognate term "actually inno-
cent." These phrases are misleading. A defendant is either
innocent or guilty. There is no separate state of being actual-
ly rather than just—just what?—innocent. So what work is
"actual" or "actually" doing? None I think. Something in the
legal genome causes lawyers and judges to want to speak in
pairs, as in "arbitrary and capricious" and "clear and con-
vincing." Ask yourself: what does "arbitrary" add to "capri-
cious" or vice versa, "clear" to "convincing" or vice versa,
"actual" to "innocence."

The history of the term "actual innocence" is revealing.
Its remote origin is a famous article by Judge Henry Friend-
ly, "Is Innocence Irrelevant? Collateral Attack on Criminal
Judgments," 38 *U. Chi. L. Rev.* 142 (1970). He argued that for
collateral attacks (as by federal habeas corpus) on criminal
convictions—attacks based for example on alleged federal
constitutional violations in the state proceeding—to succeed
on a procedurally barred claim, generally the petitioner
should be required to present evidence that he probably was
innocent of the crime for which he had been convicted.
Three justices of the Supreme Court adopted Judge Friend-
ly's suggestion in *Kuhlmann v. Wilson*, 477 U.S. 436 (1986),
where Justice Powell, writing for the plurality, added "fac-
tual" before "innocence." The Court adopted this formula-
tion, minus the "f," to create the "actual innocence" excep-
tion to procedural default at issue in this case. See *Murray v.
Carrier*, 477 U.S. 478 (1986). The term is understood to distin-
guish not having committed the crime of which one was
charged from having been entitled to acquittal on some
ground unrelated to the merits, such as lack of jurisdiction.
See *Bousley v. United States*, 523 U.S. 614, 623 (1998) ("'actual
innocence' means factual innocence, not mere legal insuffi-

ciency"). It would have been more accurate to say that some acquittals are based on the defendant's having been found innocent of the crime or crimes with which he was charged, and others are based on reasons unrelated to guilt or innocence, such as lack of jurisdiction, violation of certain constitutional rights (for example, rights conferred by the Fourth Amendment), or expiration of the statute of limitations. Fair enough, but the adjectives "factual" and "actual" add nothing to the distinction. The Court should have stuck with "innocence," dropping both adjectives.

Another familiar term in legal discourse that appears in the majority opinion in this case and that I would like to see purged is "procedural default," a cumbersome alternative to "forfeiture." The failure of a petitioner for federal habeas corpus to have given the state courts a chance to rule on the claim he seeks to vindicate in the habeas corpus proceeding normally forfeits the right to press the claim in federal court. But the petitioner can be relieved of his forfeiture—as he should be in this case with regard to the hair-salon witnesses irrespective of the fate of the alibi witnesses—if he has strong though not necessarily conclusive evidence of his innocence.