In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21‐1402
JERRY S. WILSON,
 Petitioner‐Appellant,
 v.

DAN CROMWELL,
 Respondent‐Appellee.
 ____________________

 Appeal from the United States District Court for the
 Eastern District of Wisconsin.
 No. 2:13‐cv‐01061 — Nancy Joseph, Magistrate Judge.
 ____________________

 ARGUED SEPTEMBER 7, 2022 — DECIDED JANUARY 23, 2023
 ____________________

 Before SYKES, Chief Judge, and HAMILTON and BRENNAN,
Circuit Judges.
 BRENNAN, Circuit Judge. Melvin Williams was shot and
killed on May 23, 2009, and two other men—Robert Taylor
and Romero Davis—were injured in the same shooting. A
Wisconsin jury found beyond a reasonable doubt that Jerry
Wilson was the gunman. He appeals from the district court’s
denial of his habeas petition under 28 U.S.C. § 2254, claiming
2 No. 21‐1402

that he received constitutionally ineﬀective assistance from
his trial and postconviction counsel.
 We do not reach the merits of Wilson’s claims because both
are procedurally defaulted. Wisconsin state courts disposed
of Wilson’s ineﬀective assistance of trial counsel claim on ad‐
equate and independent state procedural grounds. And
Wilson failed to present his ineﬀective assistance of postcon‐
viction counsel claim for one complete round of state court
review. The default of these claims is not excused by a suﬃ‐
cient showing of actual innocence, barring federal review of
the merits. Accordingly, we aﬃrm the district court’s denial
of habeas relief.
 I
 The Shooting, Investigation, and Charges. In the early morn‐
ing hours of May 23, 2009, three people were shot during an
“after‐set” party1 at a two‐story duplex unit on North 44th
Street in Milwaukee. The party was large enough that at‐
tendees were both inside the duplex and outside in the street.
 Just before gunfire began, two vehicles passed through the
crowded street in front of the duplex, and the cars’ occupants
exchanged insults with party attendees in the roadway. The
drivers parked nearby, and the passengers—who included
the three eventual victims—walked back to the party to find
the people who had yelled at them. A fistfight broke out in the
street, and then the shooting started.
 Melvin Williams suﬀered a fatal gunshot wound to the
chest and died that day. The two other victims survived. A

 1 According to witnesses at trial, an after‐set party is like a house party

or block party, where guests pay an admission fee and alcohol is served.
No. 21‐1402 3

bullet struck Robert Taylor in the foot, and Romero Davis re‐
ceived wounds to his stomach and right calf. Neither Taylor
nor Davis could identify who shot them.
 Investigation of the crime scene yielded only a modest
amount of physical evidence. Law enforcement recovered five
.40 caliber bullet casings, four .38 caliber casings, a .40 caliber
bullet, and several bullet fragments at the scene but never lo‐
cated the murder weapon. In general, the .38 caliber casings
were damaged and flattened while the .40 caliber casings
were in better condition.
 Police spoke with eyewitnesses early in the investigation.
Shakira King attended the after‐set party and identified
Wilson as the gunman to law enforcement. She also picked
Wilson out of a photo lineup. Antwan Smith‐Currin, who
lived in the upstairs duplex unit at the time, also identified
Wilson as the gunman in a photo array.
 According to detective testimony, Samantha Coats and
Sanntanna Ross identified Wilson as the shooter as well, alt‐
hough at trial the women either denied having made such
identification or sharply qualified their prior statements. Of‐
ficers arrested Wilson in July 2009, and the State charged him
with one count of reckless homicide and two counts of reck‐
less endangerment.
 Smith‐Currin testified at Wilson’s preliminary hearing
and identified him as the gunman. When asked whether he
saw other gunmen besides Wilson, Smith‐Currin answered,
“No, sir,” but acknowledged that “People w[ere] trying to say
4 No. 21‐1402

that I was shooting because I was on the porch.”2 At the hear‐
ing, the trial court found probable cause to believe that Wilson
committed a felony and ordered him bound over for trial.
 Jury Trial. In August 2010, Wilson went to trial with attor‐
ney Glen Kulkoski as his counsel. Given the minimal physical
evidence, the case centered on the testimony of four eyewit‐
nesses. Smith‐Currin took the stand and identified Wilson as
the gunman, consistent with his previous statements to law
enforcement. He testified to seeing Wilson walk between two
houses, approach the crowd in the street, and open fire with
a handgun. Yet Smith‐Currin’s testimony contained discrep‐
ancies. For instance, he testified to standing on the porch
when he saw Wilson open fire, but he was cross‐examined
with his prior sworn statement that he had been in the street
when he saw the shooting.
 King also testified at trial and identified Wilson as the
shooter. King’s account largely mirrored Smith‐Currin’s: Wil‐
son emerged from between two houses on the same side as
the duplex and opened fire. But King also provided certain
discrepant details. For example, she was neither consistent in
describing her position relative to the gunman, nor certain of
the distance between them. At trial, she first suggested that
she was two feet from the gunman. But following a courtroom
distance demonstration, she changed that estimate to fifteen
feet. She also said that the shooter had a ponytail but had pre‐
viously told police that he wore his hair in braids. Finally,
King testified she was not involved in the street fight, but pre‐
viously told oﬃcers that she had participated.

 2 The two‐story duplex has an upper and a lower porch. Smith‐Currin

testified at trial that he was on the lower porch at the time of the shooting.
No. 21‐1402 5

 The State also called two other eyewitnesses to testify.
Sanntanna Ross said she did not see who shot because she was
fighting in the street during the shooting. That prompted the
State to try to impeach her with her prior statements to law
enforcement inculpating Wilson. Per testimony from investi‐
gating detectives, Ross identified Wilson as the shooter and
recognized his face in a photograph. In response to the im‐
peachment evidence, Ross claimed she felt pressure from po‐
lice to “get [her] to say things that [she] didn’t want to say.”
 Samantha Coats testified that, in the seconds before the
shooting, she was looking out of a nearby second‐story win‐
dow with a view of the street. She described seeing an indi‐
vidual come into the street near the duplex and start shooting.
When asked at trial, she agreed that the gunman’s silhouette
fit Wilson’s description, but she did not make an aﬃrmative
identification. As with Ross, the State tried to impeach Coats
with prior statements. According to police documents and
testimony, Coats selected Wilson’s photograph during a
photo lineup, indicated he was the shooter, and wrote “I’m
sure is the shooter” on the photo lineup paper near her signa‐
ture. In response, Coats explained she was “under a lot of
pressure” from law enforcement and believed that she “was
going to be taken into custody.” Coats likewise agreed with
defense counsel that her statements to police were made to
please the detectives and to avoid getting herself in trouble.
 The State called other witnesses to talk about the physical
evidence. Detectives described where they found the diﬀerent
bullet casings and explained that the location of the .40 caliber
casings was generally consistent with a gunman firing from
an alleyway near the duplex. A firearm examiner opined that
6 No. 21‐1402

the .38 caliber casings were all fired out of one gun while the
.40 casings were all fired from a second weapon.
 After the State rested, Wilson called three witnesses in his
defense. Kawana Robinson, Aaron Lee, and Shantell Johnson
all testified that they did not see Wilson at the after‐set party
the night of the shooting.
 All in, the accounts of the trial witnesses varied. For in‐
stance, the shooter’s height was described as five‐foot‐three
by one witness, and five‐foot‐eleven by another. One witness
said the shooter was wearing a fleece‐style top with no hood,
while others testified he was either wearing a baseball hat or
had a hood up. There was also disagreement about whether
the shooter wore his hair in a ponytail or in braids. Finally, at
least two witnesses claimed it was too dark to discern any de‐
tails about the gunman.
 The jury found Wilson guilty on all three counts, and the
court sentenced him to 28 years’ imprisonment.
 Wilson’s § 974.02 Proceedings and Possible New Evidence.
Post‐judgment, two events unfolded simultaneously. In the
fall of 2010, Wilson obtained postconviction counsel (Thomas
Simon)3 and challenged his conviction. Wilson began by pur‐
suing a claim for ineﬀective assistance of trial counsel which,
in Wisconsin, is brought as a § 974.02 motion in the trial court.
See WIS. STAT. §§ 809.30, 974.02; Lee‐Kendrick v. Eckstein, 38
F.4th 581, 586 (7th Cir. 2022). Wilson filed that motion in April

 3 Throughout we refer to Thomas Simon, who assisted Wilson during

his § 974.02 proceeding, as Wilson’s “postconviction counsel.” “Postcon‐
viction counsel” refers exclusively to Simon and should not be confused
with Christopher August, who assisted Wilson with his § 974.06 state col‐
lateral attack, or with Wilson’s current federal habeas counsel.
No. 21‐1402 7

2011, arguing that trial counsel had failed to properly investi‐
gate the case, raise a key defense, and thoroughly cross‐exam‐
ine a State witness.
 Also during the fall of 2010, Wilson had been investigating
new evidence. He alleges that three to four months after the
trial concluded, he became aware of a new eyewitness
through a fellow inmate named Deangelo Harvey. In late
2010, Harvey purportedly told Wilson that a woman living in
the duplex was home on the night of the shooting, but he did
not provide a name or any other specifics. Nonetheless, Wil‐
son claims he eventually received a letter from that woman—
Lakisha Wallace—sometime between March and June of 2011.
Per Wilson, Wallace explained in her letter that she had “in‐
formation about what happened that night” but provided no
other details. Wilson said he wrote back asking if she would
testify on his behalf and requesting her contact information.
In a third letter, Wallace allegedly agreed and provided Wil‐
son a post oﬃce box number.4 Thereafter, Wilson claims that
his mother got in touch with Wallace and that Wallace spoke
with his postconviction counsel. Nonetheless, there is no evi‐
dence that Wilson’s postconviction counsel ever obtained an
aﬃdavit from Wallace or involved her in the direct appeal.
 The Wisconsin trial court denied Wilson’s § 974.02 motion
on April 18, 2011, and Wilson appealed. In 2012, the Wiscon‐
sin Court of Appeals denied relief, and the Wisconsin Su‐
preme Court declined to grant review, ending Wilson’s direct
appeal.
 Wilson’s § 974.06 Proceedings. Almost a year after Wilson
lost his direct appeal, he acquired a notarized statement from

 4 Wilson did not keep any of the letters nor did he make copies.
8 No. 21‐1402

Wallace—the same individual with whom he had allegedly
exchanged letters in 2011. In her July 1, 2013, statement, Wal‐
lace accused Smith‐Currin of being the shooter and said that
Wilson was innocent. Wilson then filed a pro se postconvic‐
tion motion under § 974.06 in Wisconsin state court, alleging
ineﬀective assistance of both trial and postconviction counsel.
He also sought a hearing on the “newly discovered” Wallace
testimonial evidence. The state trial court denied relief, and
the appellate court aﬃrmed.
 Two years later, though, Wilson’s state collateral challenge
gained new life. In September 2016, he renewed his claims by
petitioning the Wisconsin Supreme Court for review. That
court ordered the State to submit a response, in which the
State acknowledged that Wilson was entitled to an eviden‐
tiary hearing on the newly discovered evidence. As the Wis‐
consin Supreme Court summarized, the State conceded in its
response that “if the allegation at issue is accepted as true,
there is a reasonable probability that a jury, looking at the old
evidence and the new evidence, would have a reasonable
doubt as to Mr. Wilson’s guilt.” So, the Wisconsin Supreme
Court granted the petition for review and remanded on the
newly discovered evidence claim. It held in abeyance the
other claims, including Wilson’s ineﬀective assistance of post‐
conviction counsel claim.
 In August 2017, an evidentiary hearing was held at which
Wallace testified to the information in her July 2013 statement.
She explained that, on the night of the shooting, she was liv‐
ing on the first floor of the duplex, and there was a big party
going on in the upstairs unit where Smith‐Currin lived. In the
hours leading up to the shooting, Wallace witnessed Smith‐
Currin drinking, smoking, and ingesting pills on the porch.
No. 21‐1402 9

As a result, Wallace believed that Smith‐Currin was under the
influence at the time of the shooting: “Yeah, he was very much
so under the influence. Like you could tell he was high, you
know.”
 As the party ramped up, Wallace said she noticed commo‐
tion outside her unit and observed Smith‐Currin ask his
brother for a firearm. She next saw Smith‐Currin go outside
with the handgun and yell that the partygoers should move
away from the house. According to Wallace, Smith‐Currin
then ran down the front steps and opened fire on the people
in the street. During the shooting, Wallace claims to have
heard multiple weapons firing: “It wasn’t like it was just one
gun. Like you could hear diﬀerent guns going oﬀ. It wasn’t
like just one person shooting outside.” Wallace testified fur‐
ther that, once the shooting stopped, Smith‐Currin tried to
come inside her unit. She refused him entry but overheard
Smith‐Currin tell his brother that he had just shot someone.
Wallace also reported hearing Smith‐Currin discuss pinning
the crime on Wilson.
 Wilson took the stand next. He explained how Wallace
reached out to him after his conviction in 2011, and he de‐
scribed their alleged exchange of letters. Wilson also testified
that, in the hours before the party, he had helped set up a mu‐
sic system for Wallace at the duplex.
 Yet despite having been to Wallace’s residence just hours
before the shooting, Wilson said it never occurred to him that
she might have information about the incident. Indeed, Wil‐
son never brought Wallace to trial counsel’s attention or oth‐
erwise reached out to her pretrial. Per Wilson, it was not until
Wallace wrote to him that he realized she might have helpful
information. And while Wilson claimed he notified
10 No. 21‐1402

postconviction counsel about Wallace during his direct ap‐
peal, he could not explain why his counsel failed to act on the
Wallace lead.
 After the hearing, the state trial court denied Wilson’s re‐
quest for a new trial. In its oral ruling, the trial court found
that, “[g]enerally, Miss Wallace’s testimony was credible and
worthy of belief.”5 But the judge assessed Wilson’s statements
diﬀerently, explaining, “Mr. Wilson’s testimony is not credi‐
ble. It is not worthy of belief. I give his testimony zero
weight.” The court observed that Wilson had recounted re‐
ceiving letters from Wallace, yet Wallace testified she was il‐
literate. As the court explained, “Miss Wallace doesn’t have
the ability to correspond with the defendant. She can’t read.
She can’t write.” At bottom, the trial court held that Wilson
was negligent in failing to present the newly discovered evi‐
dence to the jury and thus not entitled to a new trial.
 Wilson then made a strategic decision to streamline his
case. He voluntarily dismissed his petition for review (with
his ineﬀective assistance of postconviction counsel claim),
which the Wisconsin Supreme Court had held in abeyance, so
that he could appeal the denial of his request for a new trial
based on new evidence. Nonetheless, Wilson’s appeal of his
newly discovered evidence claim failed. The Wisconsin Court
of Appeals agreed with the trial court that Wilson was negli‐
gent in not presenting the Wallace evidence earlier and denied
relief. Soon after, the Wisconsin Supreme Court declined

 5 The trial court qualified this credibility finding somewhat, explain‐

ing, “Miss Wallace does have some limitations that undermine her credi‐
bility, not enormously, but there are areas where her testimony could be
more credible.” One such issue was that Wallace “ha[d] some difficulties
in sequence of events.”
No. 21‐1402 11

review. Having lost on the newly discovered evidence claim
and having voluntarily dismissed his other claims pending in
the Wisconsin Supreme Court, the doors to state court relief
closed for Wilson.
 Habeas Corpus Petition. Wilson then turned to federal court.
He had timely filed an original federal habeas petition on Sep‐
tember 20, 2013, which the district court stayed pending ex‐
haustion of state proceedings. After his state court path was
foreclosed, he amended his habeas petition on July 30, 2019,
alleging three grounds for relief: (1) ineﬀective assistance of
trial counsel; (2) ineﬀective assistance of postconviction coun‐
sel; and (3) newly discovered evidence.
 The district court ruled that Wilson procedurally de‐
faulted his claim for ineﬀective assistance of trial counsel.
Likewise, the court decided that the default was not excused
because Wilson failed to make a suﬃciently strong showing
of actual innocence. On the ineﬀective assistance of postcon‐
viction counsel claim, the district court did not explicitly en‐
gage with procedural default. Instead, the court found that
Wilson could not show constitutionally ineﬀective assistance
on the merits. Finally, the district court disposed of the newly
discovered evidence claim, finding that the discovery of new
evidence alone does not qualify as grounds for federal habeas
relief absent an independent constitutional violation. The dis‐
trict court also denied Wilson a certificate of appealability.
 At Wilson’s request, we granted a certificate of appealabil‐
ity under 28 U.S.C. § 2253(c)(2) for the following issues:
  Whether Wilson has established ineﬀective
 assistance of trial counsel;
12 No. 21‐1402

  Whether Wilson has made a strong enough
 showing of actual innocence to excuse any
 procedural defaults;
  Whether the federal constitutional right to
 counsel applies to Wisconsin postconviction
 counselʹs performance; and
  Whether, if the federal constitutional right to
 counsel applies to Wisconsin post‐convic‐
 tion counsel, the standard for ineﬀective as‐
 sistance is met here.
After reviewing the petition and record, we aﬃrm the district
court’s denial of Wilson’s petition for federal habeas relief for
the reasons that follow.6
 II
 As noted, the district court dismissed Wilson’s habeas pe‐
tition. “When reviewing a district court’s ruling on a habeas
corpus petition, we review the district court’s factual findings
for clear error and rulings on issues of law de novo.” Sanders v.
Radtke, 48 F.4th 502, 508 (7th Cir. 2022) (quoting Lee‐Kendrick,
38 F.4th at 585–86). As to whether a claim is procedurally de‐
faulted, our review is de novo. Garcia v. Cromwell, 28 F.4th 764,
771 (7th Cir. 2022) (citing Johnson v. Thurmer, 624 F.3d 786, 789
(7th Cir. 2010)).

 6 The court thanks Vladimir J. Semendyai, Esq., Andrew P. LeGrand,

Esq., Pooja Patel, Esq., and Zachary T. Reynolds, Esq. of Gibson, Dunn &
Crutcher LLP for accepting this appointment and for their fine represen‐
tation of Wilson throughout this appeal.
No. 21‐1402 13

 A
 We first consider whether Wilson’s claim for ineﬀective as‐
sistance of trial counsel is procedurally defaulted. The State
contends it is because the state court disposed of Wilson’s
claim on an adequate and independent state law ground. Wil‐
son seems to acknowledge this but focuses instead on over‐
coming default through the actual innocence gateway. We
hold that Wilson’s claim for ineﬀective assistance of trial
counsel is indeed procedurally defaulted.
 “[A] state prisoner must exhaust available state remedies
before presenting his claim to a federal habeas court.” Davila
v. Davis, 137 S. Ct. 2058, 2064 (2017) (citing 28 U.S.C.
§ 2254(b)(1)(A)). A “corollary” to that rule is that federal
courts may not review federal claims that the state court de‐
nied on an adequate and independent state procedural
ground. Id. So, we begin by examining the state court’s treat‐
ment of Wilson’s claim for ineﬀective assistance of trial coun‐
sel.
 The Wisconsin Court of Appeals was the final state court
to evaluate Wilson’s ineﬀective assistance of trial counsel
claim, and it denied that claim as inadequately pleaded under
State v. Allen, 682 N.W.2d 433 (Wis. 2004).7 Per Wisconsin law,
a defendant claiming ineﬀective assistance of counsel must
plead “suﬃcient material facts—e.g., who, what, where,
when, why, and how—that, if true, would entitle him to the

 7 The Wisconsin Supreme Court denied Wilson’s ensuing petition for

review without comment. Therefore, we look to the Wisconsin Court of
Appeals’ decision. See Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018) (holding
that federal courts on habeas review look to the “last related state‐court
decision that [ ] provide[s] a relevant rationale”).
14 No. 21‐1402

relief he seeks.” Id. at 436; see also id. at 441–42; State v. Bentley,
548 N.W.2d 50, 53–54 (Wis. 1996). State trial courts may deny
such a claim without a hearing based on a defendant’s recita‐
tion of “conclusory allegations” or failure to “raise facts suﬃ‐
cient to entitle the movant to relief.” Allen, 682 N.W.2d at 437;
see also Whyte v. Winkleski, 34 F.4th 617, 622 (7th Cir. 2022) (de‐
scribing the Allen pleading standard).
 Applying that standard, the Wisconsin Court of Appeals
determined that Wilson’s ineﬀective assistance of counsel
claim was insuﬃciently pleaded under Allen: “Despite a
lengthy recitation of the standards set forth in Bentley and Al‐
len for a suﬃcient postconviction motion, Wilson fails to make
suﬃcient allegations to warrant relief.” The state appellate
court continued, “Because the allegations in the postconvic‐
tion motion were insuﬃcient under Bentley and Allen,
whether to grant a hearing was committed to the [trial] court’s
discretion. We discern no erroneous exercise of that discre‐
tion.” In denying Wilson’s claim for ineﬀective assistance of
trial counsel under the Allen standard, the state court of ap‐
peals relied on an adequate and independent state law
ground.
 As stated, federal courts “may not review federal claims
that were procedurally defaulted in state court—that is,
claims that the state court denied based on an adequate and
independent state procedural rule.” Davila, 137 S. Ct. at 2064.
The Allen standard at issue here is both adequate and inde‐
pendent. As to adequacy, “For a state‐law ground to be ‘ade‐
quate,’ it must be ‘firmly established and regularly followed.’”
Clemons v. Pfister, 845 F.3d 816, 820 (7th Cir. 2017) (quoting
Walker v. Martin, 562 U.S. 307, 316 (2011)). The state law
ground also “must not have been applied in a manner that
No. 21‐1402 15

‘impose[s] novel and unforeseeable requirements without fair
or substantial support in prior state law’ or ‘discriminate[s]
against claims of federal rights.’” Id. (quoting Walker, 562 U.S.
at 320–21). When examining the adequacy of a state law pro‐
cedural ground, our review is limited to whether the proce‐
dural ground “is a firmly established and regularly followed
state practice at the time it is applied, not whether the review
by the state court was proper on the merits.” Lee v. Foster, 750
F.3d 687, 694 (7th Cir. 2014).
 We have previously held the Allen pleading standard is a
firmly established and regularly followed state practice, and
we do so here. In Lee v. Foster, the Wisconsin Court of Appeals
denied Lee’s claim for ineﬀective assistance of counsel and
“found that the allegations regarding [Lee’s] postconviction
counsel’s performance were conclusory and legally insuﬃ‐
cient” under the Allen standard. Id. at 693. On federal habeas
review, we held that Lee’s claim was procedurally defaulted
and that the Allen rule “is a well‐rooted procedural require‐
ment in Wisconsin and is therefore adequate.” Id. at 694. So,
the Allen standard functions as an adequate state law ground
for denial of Wilson’s ineﬀective assistance of trial counsel
claim.
 The Allen pleading standard is also independent. A state‐
law procedural ground satisfies the independence prong
when “the court actually relied on the procedural bar as an
independent basis for its disposition of the case.” Lee‐Kendrick,
38 F.4th at 587 (quoting Garcia, 28 F.4th at 774). Here, the Wis‐
consin Court of Appeals explicitly referenced and relied upon
the Allen procedural rule in disposing of Wilson’s claim for
ineﬀective assistance of trial counsel. Thus, the Allen standard
served as an independent state law ground for denying
16 No. 21‐1402

Wilson’s claim. We have reached the same conclusion in other
cases implicating the Allen standard. See, e.g., Lee, 750 F.3d at
693 (holding that the Allen rule “clearly served as an inde‐
pendent basis for the court’s denial of [petitioner’s] motion”);
Triplett v. McDermott, 996 F.3d 825, 829–30 (7th Cir. 2021) (con‐
cluding that the Allen pleading standard is an adequate and
independent basis for the state court’s denial of petitioner’s
ineﬀectiveness claim). So, the district court properly ruled
that Wilson’s ineﬀective assistance of trial counsel claim was
procedurally defaulted, and we aﬃrm that decision.
 B
 Next up is Wilson’s claim that his postconviction counsel
rendered ineﬀective assistance during the § 974.02 proceed‐
ing. This claim implicates the proper classification of § 974.02
proceedings, but in Lee‐Kendrick we already decided that: “[A]
claim of ineﬀective assistance of counsel under [Wisconsin
Statute] § 974.02 is part of a direct appeal rather than a request
for collateral review.” 38 F.4th at 587. So, 28 U.S.C. § 2254(i),
which bars federal habeas relief for the ineﬀective assistance
of counsel at collateral post‐conviction proceedings, does not
preclude Wilson’s claim here.
 With that, we move to whether Wilson procedurally de‐
faulted his claim for ineﬀective assistance of postconviction
counsel. The State argues that Wilson defaulted this claim by
failing to present it for one complete round of state court re‐
view. Wilson does not vigorously contest that position, focus‐
ing instead on overcoming default.
 Under 28 U.S.C. § 2254(b)(1)(A), a petition for federal ha‐
beas relief shall not be granted unless it appears that “the ap‐
plicant has exhausted the remedies available in the courts of
No. 21‐1402 17

the State.” Applying that provision, we have held that “[t]o
fairly present [a] federal claim, a petitioner must assert that
claim throughout at least one complete round of state‐court
review, whether on direct appeal of his conviction or in post‐
conviction proceedings.” Richardson v. Lemke, 745 F.3d 258,
268 (7th Cir. 2014) (citing McDowell v. Lemke, 737 F.3d 476, 482
(7th Cir. 2013)). The complete round rule “means that the pe‐
titioner must raise the issue at each and every level in the state
court system, including levels at which review is discretion‐
ary rather than mandatory.” Id. (citing Lewis v. Sternes, 390
F.3d 1019, 1025–26 (7th Cir. 2004)).
 Wilson voluntarily dismissed his claim for ineﬀective as‐
sistance of postconviction counsel before the Wisconsin Su‐
preme Court ruled on it. That voluntary dismissal eﬀected the
same outcome as not filing a petition in the first place—the
Wisconsin Supreme Court never evaluated his claim for inef‐
fective assistance of postconviction counsel. As a result, Wil‐
son’s claim for ineﬀective assistance of postconviction counsel
is procedurally defaulted. See Johnson v. Foster, 786 F.3d 501,
504–05 (7th Cir. 2015) (holding that defendant’s failure to file
a petition for review with the Wisconsin Supreme Court vio‐
lated the complete round of review rule). Without an entire
round of state‐court review, Wilson procedurally defaulted
his claim.
 III
 Where, as here, a petitioner’s claims are procedurally de‐
faulted, federal habeas review is precluded unless the pris‐
oner demonstrates either of two things. Coleman v. Thompson,
501 U.S. 722, 750 (1991). The petitioner may demonstrate
“cause for the default and actual prejudice as a result of the
alleged violation of federal law,” or he may “demonstrate that
18 No. 21‐1402

failure to consider the claims will result in a fundamental mis‐
carriage of justice.” Id. Moreover, “[t]he miscarriage of justice
exception ‘applies only in the rare case where the petitioner
can prove that he is actually innocent of the crime of which he
has been convicted.’” Blackmon v. Williams, 823 F.3d 1088, 1099
(7th Cir. 2016) (quoting McDowell, 737 F.3d at 483); see also
Sawyer v. Whitley, 505 U.S. 333, 339 (1992). Wilson does not
allege cause and prejudice,8 so we focus on the actual inno‐
cence exception.
 Wilson maintains that he has made a suﬃcient showing of
actual innocence and urges us to review the merits of his
claims. First, he suggests that the State has already admitted
that statements made during state court proceedings would
have given a jury reasonable doubt, and thus conceded the
question of actual innocence. Wilson further asserts that Wal‐
lace’s testimony is suﬃciently compelling and thus “there can
be little doubt that [he] has satisfied the actual innocence
standard.” More precisely, Wilson contends that the Wallace
testimony is persuasively exculpatory and that Smith‐Cur‐
rin’s preliminary hearing statements corroborate Wallace’s
account. He also tries to downplay the probative force of the
inculpatory record evidence.
 The State responds that the Wallace evidence—including
when considered with the rest of the trial evidence—falls
short of suﬃciently establishing actual innocence. It contends
Wallace’s testimony is uncorroborated and in tension with
other testimonial and physical evidence. It also highlights

 8 At oral argument Wilson’s counsel informed us that Wilson was not

pursuing relief on a cause‐and‐prejudice theory. See Oral Arg. at 6:12–7:02.
No. 21‐1402 19

that, even if true, Wallace’s account does not technically rule
Wilson out as a potential gunman.
 We start with whether the State conceded that Wilson has
made a suﬃcient showing of actual innocence. Wilson is cor‐
rect that the State previously admitted he was entitled to a
hearing on the newly discovered evidence. After Wilson filed
a pro se motion about that evidence, both the state trial and
appellate courts declined his request for a hearing. Wilson ap‐
pealed to the Wisconsin Supreme Court, and on that court’s
direction, the State filed a response conceding that Wilson was
entitled to a hearing. Specifically, the State admitted it was
“reasonably probable that if a jury were to find Wallace cred‐
ible, her testimony would create a reasonable doubt about
whether Wilson was the shooter.”
 Even so, the federal standard for a showing of actual inno‐
cence demands more than what the State conceded. When we
evaluate an actual innocence claim for purposes of federal ha‐
beas review, the appropriate question is whether “it is more
likely than not that no reasonable juror would have convicted
[Wilson] in the light of the new evidence.” Schlup v. Delo, 513
U.S. 298, 327 (1995). “To be credible, such a claim requires pe‐
titioner to support his allegations of constitutional error with
new reliable evidence—whether it be exculpatory scientific
evidence, trustworthy eyewitness accounts, or critical physi‐
cal evidence—that was not presented at trial.” Id. at 324. The
burden rests on the petitioner to make the requisite showing.
Id. at 327. This is a more demanding standard than what is
required to merit a hearing. The State’s concession that Wil‐
son was entitled to a state‐court evidentiary hearing does not
also serve as an admission that Wilson has shown actual in‐
nocence. Language from Schlup clarifies this point. There, the
20 No. 21‐1402

Supreme Court explained that “[t]he meaning of actual inno‐
cence … does not merely require a showing that a reasonable
doubt exists in the light of the new evidence, but rather that
no reasonable juror would have found the defendant guilty.”
Id. at 329. So, the State did not concede the question of actual
innocence.
 We further hold that Wallace’s testimony does not suﬃ‐
ciently establish Wilson’s actual innocence. At the outset, we
acknowledge that this evidence is both new and credible,
which are predicate requirements for the actual innocence
gateway. Id. at 324. The evidence is new because it was not
presented at Wilson’s trial, and it is credible because the Wis‐
consin Court of Appeals found that Wallace’s testimony was
generally worthy of belief. In this appeal, the State also recog‐
nizes as much.
 Yet the presentation of new and credible evidence does not
automatically satisfy the Schlup standard for actual innocence.
Instead, the new evidence must be considered along with the
existing evidentiary record. “In applying this standard, we
must consider all the evidence, both old and new, incriminat‐
ing and exculpatory, without regard to whether it would nec‐
essarily be admitted at trial.” Blackmon, 832 F.3d at 1101 (citing
House v. Bell, 547 U.S. 518, 538 (2006)). From there, we make a
probabilistic determination about what reasonable jurors
would do. House, 547 U.S. at 538. The requisite probability is
established only if Wilson shows that “it is more likely than
not that no reasonable juror would have convicted him in the
light of the new evidence.” Schlup, 513 U.S. at 327. Finally, we
always keep in mind that the “Schlup standard is demanding
and permits review only in the ‘extraordinary’ case.” House,
547 U.S. at 538 (quoting Schlup, 513 U.S. at 327); see also
No. 21‐1402 21

McQuiggin v. Perkins, 569 U.S. 383, 401 (2013) (“We stress once
again that the Schlup standard is demanding.”).
 Adhering to the rigor of the Schlup standard for actual in‐
nocence, we cannot say that the Wallace evidence is so com‐
pelling and unequivocal that no reasonable juror would have
convicted Wilson in the light of it. Wallace’s testimony just
adds a new voice to a highly complex, and often inculpatory,
evidentiary record. For instance, both Smith‐Currin and King
still unequivocally identified Wilson as the gunman and de‐
scribed him emerging from an alleyway and opening fire. A
reasonable juror could credit their testimony as honest and
compelling—especially since a detective testified that the lo‐
cation of the .40 bullet casings was generally consistent with
a shooter coming from the alleyway.
 A reasonable juror could likewise find the State’s impeach‐
ment evidence of Samantha Coats and Sanntanna Ross—
which included Coats’ prior identification of Wilson as the
gunman during a photo lineup—persuasive. Plus, Wallace’s
testimony and the physical evidence do not foreclose the ex‐
istence of multiple shooters. Wallace testified she heard mul‐
tiple guns firing, and detectives recovered two diﬀerent sets
of bullet casings. She explained “[i]t wasn’t like it was just one
gun. Like you could hear diﬀerent guns going oﬀ. It wasn’t
like just one person shooting outside.” So, a reasonable juror
could consider Wallace’s testimony and still find that Wilson
was one of two (or more) shooters. Plus, no other witness’s
account of the shooting matches Wallace’s. The closest corrob‐
oration of Wallace’s version comes from Smith‐Currin’s pre‐
liminary hearing statement, in which he testified that people
thought he was shooting. But that advances the ball little,
22 No. 21‐1402

because Wallace is still the only identified witness to accuse
Smith‐Currin of being the gunman.
 The discrepancies in testimony do not end there. As men‐
tioned, witnesses provided varied accounts of the shooting
and the shooter. Whether it is the gunman’s height, hair, or
clothing, the witnesses’ recollections diﬀered. Reasonable ju‐
rors could draw diﬀerent conclusions from this evidence.
Even with Wallace’s testimony, we are left with a series of
competing eyewitness accounts. When evaluating a claim of
actual innocence, our role “is not to make an independent fac‐
tual determination about what likely occurred, but rather to
assess the likely impact of the evidence on reasonable jurors.”
House, 547 U.S. at 538. As the dissent emphasizes, a state court
found Wallace’s testimony to be credible. But that finding
does not mean that a reasonable juror would necessarily
credit Wallace’s account of the shooting over that of any other
witness, such as Smith‐Currin or King. A conflict between
trial testimony remains, notwithstanding Wallace’s credibil‐
ity, and we cannot say that it is more likely than not that no
reasonable juror would have convicted Wilson in the light of
the new evidence.
 Our conclusion accords with relevant precedent. In Black‐
mon, the court heard competing eyewitness testimony. 823
F.3d 1088. There, two gunmen approached a victim and
opened fire. Id. at 1092. The ensuing bench trial focused on the
identity of the second gunman, and eyewitness testimony was
paramount. Id. at 1092, 1095–96. Approximately two months
after the shooting, two eyewitnesses identified Blackmon as
one of the triggermen through photo lineups and in‐person
lineups. Id. at 1094. Those same witnesses identified Black‐
mon as the gunman at trial. Id. at 1093–95. In response,
No. 21‐1402 23

Blackmon called three defense witnesses. Two of those wit‐
nesses provided an alibi for Blackmon; the third claimed to
have watched the shooting and testified that Blackmon was
not present at the scene. Id. at 1095–96. The presiding judge
determined that Blackmon was one of the shooters and found
him guilty. Id. at 1096.
 Like Wilson, Blackmon challenged his conviction through
federal habeas and tried to pass through the actual innocence
gateway for certain defaulted claims. Id. at 1100–01. To that
end, Blackmon provided two new eyewitness aﬃdavits. Id. at
1097. Each of the new witness aﬃdavits claimed that Black‐
mon was not one of the gunmen. Id. Reviewing all the evi‐
dence—old and new—this court concluded that Blackmon’s
showing of actual innocence was insuﬃcient. Id. at 1101–02.
In reaching that conclusion, this court noted that the new
evidence merely contrasted with the State’s two credible eye‐
witness accounts. Id. And the new eyewitnesses did not come
forward until eight years after the shooting. Id. at 1102. So, the
“balance between inculpatory and exculpatory witnesses
[was] not enough to meet the demanding Schlup standard for
actual innocence.” Id.
 The facts here track those in Blackmon. Like Blackmon, Wil‐
son oﬀers new eyewitness testimony into a factual record oc‐
cupied by contrasting eyewitness statements. But as ruled in
Blackmon, the introduction of new eyewitness testimony does
not amount to a showing of actual innocence when strong and
credible testimony to the contrary remains. Just as the two
new aﬃdavits in Blackmon merely added to the balance of in‐
culpatory and exculpatory evidence, so too does Wallace’s
testimony. Even with the Wallace evidence, we are left with a
24 No. 21‐1402

complex factual record pointing in diﬀerent directions.9 We
therefore hold that Wilson has not satisfied the Schlup stand‐
ard for actual innocence. Other cases from this court also sup‐
port our conclusion. See, e.g., Smith v. McKee, 598 F.3d 374,
387–88 (7th Cir. 2010) (concluding insuﬃcient showing of ac‐
tual innocence where petitioner’s two new aﬃdavits did not
suﬃciently counter the state’s evidence, which included two
eyewitness identifications and a self‐inculpatory statement);
Hayes v. Battaglia, 403 F.3d 935, 937–38 (7th Cir. 2005) (holding
that a draw between the number of eyewitnesses for and
against defendant—six new exculpatory witnesses versus the
state’s six inculpatory trial witnesses—“cannot establish that
no reasonable factfinder would have found the applicant
guilty”) (cleaned up).
 Finally, Jones v. Calloway, 842 F.3d 454 (7th Cir. 2016), is in‐
structive as a rare case where we concluded that the defend‐
ant had made a suﬃcient showing of actual innocence. Jones
was convicted of murder and sought federal habeas relief. The
district court held his claims procedurally defaulted, forcing
Jones to rely on the actual innocence gateway to excuse his
default. Id. at 459. The new evidence Jones brought to bear on
his case was exceptional. Michael Stone, another man present
at the murder scene, provided new testimony that he was the
lone shooter. Id. at 460. And his testimony was compelling.

 9 The dissent observes that, unlike in Blackmon, 823 F.3d at 1093, the

inculpatory witnesses here knew Wilson before the shooting. For our dis‐
senting colleague, that prior knowledge dilutes the weight of the photo
lineup identifications by King and Smith‐Currin. But Wallace was not a
stranger to Wilson or Smith‐Currin, either. Indeed, at the evidentiary hear‐
ing Wallace testified she had been around Smith‐Currin “plenty of times”
before the shooting, and Wilson helped set up the music at Wallace’s
apartment on the night of the crime.
No. 21‐1402 25

Stone had previously turned himself in for the crime, con‐
fessed to the shooting within days, identified the murder
weapon, and given testimony that was consistent with the
case’s forensic evidence. Id. at 462. Stone’s story of the shoot‐
ing had also remained consistent for over a decade. Id. at 463.
The district court found a suﬃcient showing of actual inno‐
cence, and this court agreed. Id. at 460, 462.
 In Jones, the new witness took the stand and personally
claimed sole responsibility for the crime. Id. at 462. His testi‐
mony was consistent with the physical evidence as well,
whereas the testimony of prosecution witnesses in that case
was often in tension with the forensics. Id. The Wallace evi‐
dence is not so forceful. Her eyewitness testimony merely
contrasts with that of Smith‐Currin and King (and to a lesser
degree, Coats and Ross). Reviewing all the facts, a reasonable
juror could still conclude that Wilson was the shooter. Ac‐
cordingly, Wilson has not suﬃciently shown actual inno‐
cence.
 IV
 Given the unexcused procedural default, we do not reach
the merits of Wilson’s ineﬀective assistance of trial and post‐
conviction counsel claims.
 In summary, Wisconsin state courts disposed of Wilson’s
ineﬀective assistance of trial counsel claim on adequate and
independent state grounds, and he failed to present his inef‐
fective assistance of postconviction counsel claim for one
complete round of state court review. So, both of his claims
are procedurally defaulted. Wilson attempts to overcome
these defaults, but he fails to make a suﬃcient showing of ac‐
tual innocence. Even considering Wallace’s testimony, we
26 No. 21‐1402

cannot conclude that it is more likely than not that no reason‐
able juror would have convicted Wilson. The Schlup standard
for actual innocence is high and reserved for the exceptional
case, a threshold Wilson does not clear here.
 For these reasons, the district court’s denial of Wilson’s pe‐
tition for federal habeas relief is AFFIRMED.
No. 21‐1402 27

 HAMILTON, Circuit Judge, dissenting. During post‐convic‐
tion hearings in the state courts, Lakisha Wallace testified that
the shooter was actually Antwan Smith‐Currin, who was also
the state’s chief witness against petitioner Wilson. Ms. Wal‐
lace witnessed the incident from the bottom floor of the du‐
plex where she lived downstairs from Smith‐Currin. She tes‐
tified that she heard Smith‐Currin yell to his brother to give
him a gun and then saw Smith‐Currin wave a handgun on the
front porch of the duplex, open fire, and run into the crowd
while shooting. According to Ms. Wallace, Smith‐Currin im‐
mediately came back inside and shouted to his brother that he
had “just oﬀed” someone. Ms. Wallace further testified that in
the days after the shooting, she heard Smith‐Currin say that
he planned to blame the crime on Wilson. She also oﬀered a
plausible motive for the plan to blame Wilson. Smith‐Currin
had seen his girlfriend with Wilson on the duplex porch the
day before the shooting and was angry about them being to‐
gether.
 The extraordinary feature of this habeas case is the combi‐
nation of two facts. First, the state agreed during state court
proceedings that “[i]t is reasonably probable that if a jury
were to find Ms. Wallace credible, her testimony would create
a reasonable doubt about whether Wilson was the shooter.”
Second, when Ms. Wallace actually testified before a state
court judge, that judge found her credible. Under these unu‐
sual circumstances, and given other significant weaknesses in
the state’s case, we should find that Wilson has made a show‐
ing of innocence suﬃcient to excuse his procedural default.
We should remand to the district court for an evidentiary
hearing on his claims of ineﬀective assistance of counsel.
28 No. 21‐1402

 My colleagues and I agree on all but that one decisive is‐
sue. As the majority opinion explains, under Wisconsin’s un‐
usual procedures for post‐conviction relief, Wilson had a fed‐
eral constitutional right to eﬀective assistance of counsel in
post‐trial proceedings under Wisconsin Statute § 974.02. Ante
at 16, citing Lee‐Kendrick v. Eckstein, 38 F.4th 581, 587 (7th Cir.
2022). We also agree that Wilson procedurally defaulted his
ineﬀective assistance claims in the state courts. Ante at 17.
Where we disagree is whether Wilson has shown “actual in‐
nocence” so as to excuse his procedural default.
 To avoid the consequences of his procedural default, Wil‐
son oﬀers the testimony of Lakisha Wallace to show that he is
actually innocent. See generally Sawyer v. Whitley, 505
U.S. 333, 339 (1992); Blackmon v. Williams, 823 F.3d 1088, 1099
(7th Cir. 2016). To do so, Wilson must come forward with new
evidence showing “it is more likely than not that no reasona‐
ble juror would have convicted him in the light of the new
evidence.” Schlup v. Delo, 513 U.S. 298, 327 (1995); see also
McQuiggin v. Perkins, 569 U.S. 383, 386, 390 (2013). His evi‐
dence must be reliable and may take the form of “exculpatory
scientific evidence, trustworthy eyewitness accounts, or critical
physical evidence.” Gladney v. Pollard, 799 F.3d 889, 896 (7th
Cir. 2015) (emphasis added), quoting Schlup, 513 U.S. at 324.
 In applying this test, it is essential to remember that the
hypothetical jurors would have to examine all the new and
old evidence and be convinced of guilt beyond a reasonable
doubt. That was, after all, the point of the Supreme Court’s de‐
cision in the canonical Jackson v. Virginia, 443 U.S. 307, 318–21
(1979) (issue in federal habeas review was not whether “any
evidence” supported the state conviction but whether evi‐
dence could support finding of guilt beyond a reasonable
No. 21‐1402 29

doubt). The Supreme Court has rephrased the relevant stand‐
ard (“to remove the double negative”) as requiring new evi‐
dence making it “more likely than not [that] any reasonable
juror would have reasonable doubt.” House v. Bell, 547 U.S.
518, 538 (2006). As I read this record, including Ms. Wallace’s
testimony credited by the state court, there is some evidence
to support a finding of guilt, but, per Jackson v. Virginia and
House v. Bell, any reasonable juror would have a reasonable
doubt once Ms. Wallace’s testimony is added to the mix.
 As the majority opinion presents the facts, Wilson’s trial
for the fatal shooting of Melvin Williams presented testimony
from four eyewitnesses who identified Wilson as the shooter.
From that premise, the majority opinion relies on a portion of
our decision in Blackmon where we held that new exculpatory
testimony from two eyewitnesses was not enough to over‐
come procedural default. 823 F.3d at 1102. The key to that por‐
tion of Blackmon was that Blackmon had been identified as one
of two killers independently, and consistently, by two utterly
neutral witnesses. Id. at 1101–02.1
 The case here was far shakier. No witness consistently iden‐
tified Wilson as the shooter. The two government witnesses who
identified Wilson at trial spoke to police on the night of the
shooting. Both knew Wilson at the time. They did not claim

 1 We remanded Blackmon for an evidentiary hearing on other grounds,

namely his claim that counsel was ineffective in failing to investigate ade‐
quately his alibi defense. 823 F.3d at 1104–07. After remand, Mr. Blackmon
won habeas relief on that basis. Blackmon v. Pfister, 2018 WL 741390 (N.D.
Ill. Feb. 7, 2018).
30 No. 21‐1402

that night that they saw Wilson was present, let alone shoot‐
ing.2
 That night, Shakira King told police that she had heard an‐
other woman claiming Wilson was the shooter. By the time of
trial, however, King’s story had changed. She testified that she
herself saw Wilson shooting, and she denied having told an
oﬃcer on the night of the shooting that it was her friend who
claimed to have recognized the shooter as Wilson. King’s trial
testimony also contradicted her contemporaneous descrip‐
tion of the shooter’s hairstyle. Her description of the shooter’s
clothing did not match that given by any other witness. And
at trial King denied being part of the fight that preceded the
shooting, though she had previously admitted involvement
to police and other witnesses had confirmed her part in the
melee.
 Moving to Smith‐Currin, he did not tell police that he saw
Wilson shooting until a month after the crime. On the night of
the shooting, Smith‐Currin spoke with police but did not
mention Wilson. Smith‐Currin’s trial testimony describing
what he saw the shooter wearing was inconsistent. And at a
preliminary hearing, Smith‐Currin even testified that some
people claimed they had seen him shooting from the duplex’s
porch.

 2 The fact that both witnesses knew Wilson prior to the shooting is

important. The majority opinion states correctly that King and Smith‐Cur‐
rin identified Wilson as the gunman out of photo lineups. This procedure
seems to add credibility to the identifications but its weight is diluted by
the fact that both already knew him.
No. 21‐1402 31

 The two other witnesses who the state argued had previ‐
ously identified Wilson as the shooter strongly refuted or re‐
canted such statements at trial. Sanntanna Ross told the jury
that what police construed as her identifying Wilson as the
shooter was simply her indicating that she knew Wilson.
When asked on the stand whether she saw Wilson shooting,
Ross unequivocally said no. Samantha Coats told the jury that
her prior identification of Wilson as the shooter was based
only on rumors. When Coats was pressed for an identification
by police during the investigation, she said, her boyfriend was
in custody and she had been threatened with arrest herself.
She chose Wilson (whom she knew and recognized) in a
photo lineup to avoid arrest and in the hope that the police
would release her boyfriend.
 Unlike the Blackmon case, Wilson has also oﬀered new ev‐
idence that not only exonerates him but identifies a diﬀerent
shooter, the state’s chief witness. In applying the Schlup stand‐
ard, which may be met by “trustworthy eyewitness ac‐
counts,” keep in mind that the state judge who heard Ms. Wal‐
lace testify, subject to lengthy cross‐examination, credited her
testimony.
 If a jury heard all the trial evidence and Ms. Wallace’s tes‐
timony, there would of course still be the trial testimony of
Smith‐Currin and King identifying Wilson as the shooter.
That’s “some evidence”—but that low bar was the standard
rejected in Jackson. Given the problems with their testimony—
including their delayed identifications of a person they knew
as the shooter they claimed to have seen that night—the lack
of any other evidence placing Wilson at the scene, and the
32 No. 21‐1402

consistent and credible testimony of Ms. Wallace, a conscien‐
tious juror could not reasonably find Wilson guilty beyond a
reasonable doubt.
 The majority opinion also suggests that Ms. Wallace’s tes‐
timony does not necessarily exculpate Wilson because there
might have been more than one shooter. Perhaps both Smith‐
Currin and Wilson, and even others, were armed and fired
shots? The principal problem with this possibility is that it
would make it even harder to convince a jury beyond a rea‐
sonable doubt that Wilson was the one who shot the victims.
The state prosecuted Wilson on the theory that there was one
shooter and that he was the one. The new, more complex, and
untested theory of multiple shooters does not oﬀer a solid ba‐
sis for denying relief.
 The test for actual innocence is demanding, and cases of
proven actual innocence are relatively rare. In my view, this
is one of those rare cases. I am not saying that Wilson is enti‐
tled to a new trial based on his as‐yet‐unproven claims of in‐
eﬀective assistance of counsel. But I believe he is entitled to a
hearing to try to prove them. I respectfully dissent.